Elliot FINEMAN and The Industry
Network Systems, Inc.,
Plaintiffs,

v.

ARMSTRONG WORLD INDUSTRIES,
INC., Defendant.

Civ. A. No. 84–3837.

United States District Court,
D. New Jersey.

June 20, 1991.

As Amended June 25 and Oct. 8, 1991.

Steven M. Kramer, New York City, for plaintiffs.

Crummy, Del Deo, Dolan, Griffinger & Vecchione by John J. Gibbons, Newark, N.J. (Laurence H. Tribe, Cambridge, Mass., of counsel), Stryker, Tams & Dill by Edith K. Payne, Newark, N.J., and Covington & Burling by J. Randolph Wilson, Washington, D.C., for defendant.

## OPINION

BISSELL, District Judge.

This matter arises pursuant to several motions made by the defendant in light of the jury verdict reached on April 19, 1991. Defendant Armstrong World Industries, Inc. ("Armstrong") has renewed its earlier motion to dismiss all claims of the plaintiff, for judgment notwithstanding the verdict (J.N.O.V.), and for a new trial in the alternative.

## I. FACTS AND BACKGROUND

Trial in this action took place over nearly three months, generating considerable evidence. Necessarily, then, the following is merely a summary of the background and procedural history. Where relevant to the motions herein, additional facts and evidence will be considered.

Plaintiffs are Elliot Fineman, a New Jersey resident, and The Industry Network System, Inc. ("TINS"), a New Jersey corporation of which Elliot Fineman is the majority shareholder.[1] Defendant Armstrong is a large corporation which manufactures, *inter alia*, floor covering, more particularly "resilient" floor covering often called linoleum in common parlance. In the time period most pertinent to this litigation, Armstrong also manufactured carpeting. Armstrong's products are distributed through independent companies known as wholesalers or distributors who maintain warehouse stocks of such products and use their sales personnel to solicit retailers or others to purchase such products.

In 1982 and 1983, Elliot Fineman and TINS were developing a "video magazine" for the floor covering industry. Essentially, the plan was that TINS would sell the monthly video to floor covering distributors, who would in turn sell subscriptions to the program to retailers. A distributor would sign a "Letter of Intent" to become a TINS distributor, and then Fineman and his staff would run a two or three day training program at the distributors' place of business. This program would teach the salespeople how to sell the TINS magazine and how to improve sales overall. (*See e.g.* Px. 8001 at 15, TINS brochure describing sales program.)

The video was designed to be similar to a printed magazine, with "articles" on various topics. The plaintiffs described the video as follows:

1. Carol Arena and Gail Farrar were both minority shareholders in TINS.

The magazine consisted of four parts. The first segment featured Al Wahnon, the editor of the industry newspaper (Floor Covering Weekly) who went behind the scenes of current relevant news stories and discussed and analyzed them from the floor covering retailers point of view. The second section featured plaintiff Fineman talking to professionals, such as economists and professors, or people whose areas include consumer attitudes, styling, design and from time to time sports people to discuss motivation. The third segment featured senior vice president Gail Farrar who travelled on site to retail stores throughout the country with a television crew. She interviewed at their store those retailers who are doing things that are successful, outstanding and helping them accomplish key goals. The fourth section featured the local TINS Distributor who used that segment as a marketing tool. Profits were to be earned from the sale of the magazine subscriptions, advertising royalties and commissions from the sale of video equipment.

(Compl., ¶ 11).

In early 1983, when TINS first launched its magazine, it encountered some difficulties recruiting floor covering distributors to become TINS distributors. Fineman accused Armstrong of exerting pressure on Armstrong distributors to dissuade them from becoming TINS distributors. These accusations resulted in an "Agreement of Settlement" between TINS and Armstrong on January 12, 1984, signed in order to avoid litigation.

In the following months, Fineman solicited at least six Armstrong wholesalers. Of these, three became TINS distributors, one remained ready to do so, and two declined. Fineman and TINS filed the present action on September 14, 1984, alleging that one of the distributors that declined, Stern & Company of Windsor, Connecticut, did so as a result of renewed pressure from Armstrong.[2] Plaintiffs contended that TINS was in a precarious financial condition as a result of the earlier wrongful acts of Armstrong such that losing Stern caused the company to fold. Plaintiffs therefore sought damages from Armstrong under various theories, including tortious interference with contract and antitrust violations.

This Court conducted a jury trial from January 23, 1991 until April 18, 1991.[3] The trial included testimony of more than 50 witnesses, a transcript of a thousand pages, conflicting opinions by expert witnesses, and a set of jury instructions of more than 80 pages. By the end of the trial, the only claims remaining were TINS' and Fineman's claim for tortious interference by Armstrong with TINS' business relationship with Stern and TINS' claims for monopolization and attempt to monopolize under § 2 of the Sherman Antitrust Act. On April 19, 1991, the jury returned a verdict in favor of the plaintiffs on all claims. On the tortious interference claim, the jury awarded $17.7 million to TINS and $2.275 million to Fineman in compensatory damages, and $200 million to TINS in punitive damages. The jury also awarded TINS $19.5 million in compensatory damages on the antitrust claims. Finally, the jury determined that $1.8 million was the "overlap" between the tort and antitrust damages awarded to TINS.[4]

Armstrong presently seeks judgment notwithstanding the verdict, or, in the alternative, a new trial.[5]

## II. JUDGMENT NOTWITHSTANDING THE VERDICT

### A. Standards Governing J.N.O.V.

■ Federal Rule of Civil Procedure 50(b) provides:

schedule and others by the parties and their counsel.

---

**2.** Plaintiffs' complaint alleged that Armstrong also pressured Nelson & Small (the other declining distributor from New England), but this claim was dismissed by summary judgment in this Court's Opinion and Order of May 25, 1988.

**3.** The trial was subject to breaks in the presentation of evidence, some caused by this Court's

**4.** This determination is the basis for one of the defendant's motions for a new trial.

**5.** All new trial motions will be discussed in a separate opinion to be issued shortly.

**(b) Motion for Judgment Notwithstanding the Verdict.** Whenever a motion for a directed verdict at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with the party's motion for a directed verdict.... A motion for new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed....

Thus, a prerequisite to moving for a J.N.O.V. under Rule 50(b) is that the moving party must have moved for a directed verdict at the close of all the evidence. *Associated Business Telephone Systems Corp. v. Greater Capital*, 729 F.Supp. 1488, 1502 (D.N.J.), *aff'd*, 919 F.2d 133 (3d Cir.1990) (citing *Skill v. Martinez*, 91 F.R.D. 498, 515 (D.N.J.1981), *aff'd*, 677 F.2d 368 (3d Cir.1982)). In fact, "[i]t is not enough if a party moves for a directed verdict at the close of their case. Rather, in order to preserve the right to move for a J.N.O.V., the moving party must renew his motion for a directed verdict at the close of all the evidence." (*Id.*, citing *United States for the Use and Benefit of Roper v. Reisz*, 718 F.2d 1004, 1007 (11th Cir.1983)).

There are exceptions to the latter requirement, in certain circumstances where, as detailed in *Skill:*

(a) there has been substantial, if not literal compliance with the rule;

(b) where manifest injustice will otherwise occur since the verdict is totally without legal support;

(c) where the trial judge in effect excused the failure to renew the motion; and

(d) where the additional evidence was brief and inconsequential.

(*Id.*, citing *Skill*, 91 F.R.D. at 515 n. 14). In the present matter, Armstrong made motions for directed verdict at the end of all the evidence. The motions included all of the arguments made in its motions for J.N.O.V. presently being considered.

■ The plaintiffs, however, strenuously object to the defendant's motion based on the Connecticut Business Opportunity Investment Act ("Connecticut Act") on procedural grounds, claiming that Armstrong has waived this "defense." Specifically, plaintiffs claim that Armstrong cannot rely on the Connecticut Act because the issue was not asserted in its answer as required by Fed.R.Civ.P. 8(c).

The plaintiff's arguments are without merit, for two reasons. First, the defendant specifically raised the Connecticut Act in the Pretrial Memorandum and Order, as follows:

12. Whether the alleged contract or prospective business relationship between Stern and the TINS Corporation was unlawful under the Connecticut Business Opportunity Act, or was otherwise without legal effect, and any alleged interference therewith was therefore not a tortious act?

(Pretrial Memo, Defendant's Legal Issues at 93). In this Court and the Third Circuit, the Pretrial Order governs the ensuing litigation.

Under Federal Rule of Civil Procedure 16, the pretrial order "shall control the subsequent course of the action unless modified by a subsequent order." When entered, the order limits the issues for trial and takes the place of the pleadings covered by the pretrial order. *See Basista v. Weir*, 340 F.2d 74, 85 (3d Cir.1965); *Hoagburg v. Harrah's Marina Hotel*, 585 F.Supp. 1167, 1175 (D.N.J.1984). Indeed, the pretrial order operates to preserve a claim or defense that would normally be waived by proceeding to trial. *See United States v. Hougham*, 364 U.S. 310, 316 [81 S.Ct. 13, 17, 5 L.Ed.2d 8] (1960); *reh'g denied*, 364 U.S. 938 [81 S.Ct. 376, 5 L.Ed.2d 372] (1961); *Jenkins*

*v. Carruth,* 583 F.Supp. 613, 615 (E.D.Tenn.), *aff'd,* 734 F.2d 14 (6th Cir. 1984); *United States v. Texas,* 523 F.Supp. 703, 720 (E.D.Tex.1981).

*Benvenuto v. Connecticut General Life Insurance Co.,* 643 F.Supp. 87, 88 (D.N.J.1986). *See also Petree v. Victor Fluid Power, Inc.,* 831 F.2d 1191, 1194 (3d Cir.1987) ("The finality of the pretrial order contributes substantially to the orderly and efficient trial of a case" and "supersedes the pleadings"). Because Armstrong included this claim in the Pretrial Order, it did not waive its right to assert this legal theory, and the plaintiffs had sufficient notice thereof.

Plaintiffs' reliance on cases such as *Kilbarr Corp. v. Business Systems, Inc.,* 679 F.Supp. 422 (D.N.J.1988), *aff'd,* 869 F.2d 589 (3d Cir.1989), is misplaced. In *Kilbarr,* the defendants attempted to raise an issue for the first time after the matter had been tried, heard on appeal, and then remanded. In contrast, defendant herein raised the issue in the pretrial order and again by motion for a directed verdict at the close of the evidence.

Similarly, the present matter is distinguishable from *Bradford–White Corp. v. Ernst & Whinney,* 872 F.2d 1153 (3d Cir.), *cert. denied,* 493 U.S. 993, 110 S.Ct. 542, 107 L.Ed.2d 539 (1989), in which the defendant did raise the defense in its answer, but failed to file motions or present argument on the defense until after the jury reached a verdict and the judgment was entered. (*Id.* at 1154). The trial court refused to consider the defense because it was a "new issue, not raised at trial, premised on a noncontrolling decision which was reported prior to trial." (*Id.* at 1154–1155). In affirming, the Third Circuit made it clear that the defendant did not attempt to establish the affirmative defense before or at trial, and therefore it would be "grossly unfair to allow a plaintiff to go to the expense of trying a case only to be met by a new defense after trial." (*Id.* at 1161). In the present matter, the defendant raised the issue of the Connecticut Act in the Pretrial Order of June 5, 1990, presented evidence concerning the issue, and made a

motion to dismiss at the end of all the evidence based thereon. There is no waiver here.

The second reason for considering the Connecticut Act in the present matter concerns the burden of proof. The plaintiffs bore the burden of proving each of the elements of the tortious interference claim. One of these elements, as more fully described below, is proof that TINS had a reasonable expectation of economic advantage in its relationship with Stern. In the context of the Connecticut Act, this required the plaintiffs to prove that the Act did not render any expectation tenuous or otherwise unreasonable. Thus, the plaintiffs miss the point by asserting that Armstrong failed to establish the "defense" of the Connecticut Act, because the issue is not a defense at all. It is, therefore, this Court's determination that Armstrong's motion for J.N.O.V. is appropriate in all procedural respects.

■ Once it is determined that the motion is procedurally correct, the next question is the applicable standard. This standard has been given various formulations, although they are substantially similar. "When deciding a motion for judgment notwithstanding the verdict, the trial judge must determine whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the verdict." *Bhaya v. Westinghouse Elec. Corp.,* 832 F.2d 258, 259 (3d Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989) (citing *Berndt v. Kaiser Aluminum & Chemical Sales, Inc.,* 789 F.2d 253 (3d Cir.1986)). *See also E.E.O.C. v. State v. Delaware DHSS,* 865 F.2d 1408, 1414 (3d Cir.1989). In other words, the court must determine whether a reasonable jury could have found for the prevailing party. *Newman v. Exxon Corp.,* 722 F.Supp. 1146, 1147 (D.Del.1989), *aff'd,* 904 F.2d 694 (3d Cir.1990) (citing *National Controls Corp. v. National Semiconductor Corp.,* 833 F.2d 491, 495 (3d Cir.1987); *Aloe Coal v. Clark Equipment Co.,* 816 F.2d 110, 113 (3d Cir.), *cert. denied,* 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 111 (1987); *Marsh v. Interstate*

*and Ocean Transport Co.*, 521 F.Supp. 1007, 1008 (D.Del.1981)). It has also been said that "the court must find, as a matter of law, that the prevailing party failed to adduce sufficient facts to justify the verdict." *Grace v. Mauser–Werke Gmbh*, 700 F.Supp. 1383, 1387 (E.D.Pa.1988) (citing *Link v. Mercedes Benz of North America, Inc.*, 618 F.Supp. 679, 693 (E.D.Pa.1985), *aff'd in part* 788 F.2d 918 (3d Cir.1986)). Yet another way of enunciating the standard is as follows:

It is well established that judgment notwithstanding the verdict may be granted only if, as a matter of law, the record is critically deficient of that minimum quality of evidence from which a jury might reasonably afford relief.

*National Freight v. Southeastern Pa. Transp. Auth.*, 698 F.Supp. 74, 76 (E.D.Pa. 1988), *aff'd*, 872 F.2d 413 (3d Cir.1989) (citing *Danny Kresky Enterprises Corp. v. Magid*, 716 F.2d 206, 209 (3d Cir.1983)).

The role of the Court is quite limited when considering a motion for J.N.O.V. "[T]he Court may not weigh evidence, pass on the credibility of witnesses, or substitute its judgment of facts for that of the jury." *National Freight*, 698 F.Supp. at 76 (citing *Blair v. Manhattan Life Insurance Co.*, 692 F.2d 296, 300 (3d Cir.1982)). Thus, "[a]lthough a court in viewing the evidence of record may have reached a different conclusion from that reached by the jury, that alone is not reason to enter judgment n.o.v." *Newman*, 722 F.Supp. at 1147.

The defendant herein seeks J.N.O.V. on the basis that no reasonable jury could have found for the plaintiffs on each element of each claim. It also renews a motion to dismiss both plaintiffs' tort claims due to the Connecticut Act which this Court treats as a motion for J.N.O.V., although it primarily rests on legal questions, as described more fully below. The latter motion will be considered first.

### B. Plaintiffs' Tort Claims: The Connecticut Act

The Connecticut Act requires certain types of businesses to register with the Banking Commissioner of Connecticut prior to selling business opportunities in that State. Armstrong contends that TINS was not so registered prior to its dealings with Stern, that it should have been, and that its failure rendered the relationship with Stern unenforceable, and in fact illegal. Armstrong then argues that the claim for tortious interference therewith is invalid pursuant to the terms of the statute, and so it is entitled to J.N.O.V. as to both TINS' and Fineman's tortious interference claims.

In order to understand fully Armstrong's argument, some additional facts are necessary. As stated above, Elliot Fineman solicited Stern and Company of Windsor, Connecticut to become a TINS distributor in the spring of 1984. TINS provided Stern with a brochure captioned "The Industry Network System, Stern & Company, Inc., May 24, 1984." (Px. 8001). This brochure described the sales training program that TINS would provide to Stern if Stern became a TINS distributor. It also provided a chart entitled "Preferred Distributor Annual Income Stream" showing the income to be earned by Stern from distributing the TINS Magazine and other videos. These figures included distributor profits on sales of RCA televisions and video equipment, sold for use with the TINS Magazine as a result of an arrangement between TINS and RCA. Also available were bonuses paid to Stern and its employees for each subscription sold.

As a result of the presentation made by representatives from TINS, Stern signed a "Letter of Intent" to become a distributor on May 24, 1984. The letter provided that "Stern & Company, Inc. wishes to accpet [sic] appointment as Distributor of The Industry Network System (TINS) with marketing rights" to TINS Magazine "in the primary trading areas of [Stern] ... at a fee of $16,000" plus expenses associated with the sales training program. (Px 1100A). Stern paid a deposit of $4,000 that day.

The sales training program began at Stern's place of business on Wednesday, June 20, 1984 and continued through Friday, June 22, 1984. TINS representatives

made presentations to Stern employees until late Friday afternoon, when Stern's President, Alan Abrahamson, notified TINS representatives that Stern was terminating or canceling the Letter of Intent and not going ahead with the program.

TINS alleged that Stern breached its contract and demanded payment of an additional $4,000. By letter dated June 29, 1984, Stern's attorney Steven M. Gold informed Mr. Fineman that Stern did not owe and would not pay, taking the position that the "Letter of Intent" was invalid and unenforceable. (Dx. 1003). The premise for this claim was that the Connecticut Act required businesses to register their offerings with the Banking Commissioner, which TINS had not done. So, claimed Mr. Gold, the "Letter of Intent" was invalid and TINS was potentially subject to the authority of the Commissioner. Violations could result in fines, imprisonment, and various forms of equitable action such as appointment of a receiver. The final result was an exchange of mutual releases of all claims between TINS and Stern in August 1984.

Armstrong argues in support of its motion for J.N.O.V. that the "Letter of Intent" was properly voided by Stern based on the Connecticut Act, relying upon its legislative history and statutory language. As a result, the "Letter of Intent" between Stern and TINS could not be the basis of *any* claims, including those made by plaintiffs herein. Thus, Armstrong seeks J.N.O.V. dismissing all the tortious interference claims of the plaintiffs.

This Court agrees with Armstrong, although under a slightly different analysis, that it is entitled to a directed verdict on all of plaintiffs' state-law tort claims. This Court had reserved decision on this question, preferring to permit the case to go to the jury in order that all parties, this Court and any reviewing court would have the benefit of a jury verdict on all claims presented to it, a procedure clearly contemplated by Rule 50(b). Now, however, defendant's motion must be addressed as a motion for J.N.O.V. It will be granted for the reasons which follow.

■ This Court determined, on directed verdict motions at the end of the plaintiffs' case, that New Jersey law governs the plaintiffs' tort claims. In so doing, this Court recognized that for these pendent claims, this Court must apply New Jersey's conflict of laws rule, which embodies a "governmental interest" approach to choice of law questions. *Veazey v. Doremus*, 103 N.J. 244, 248, 510 A.2d 1187 (1986). Under that analysis, the determinative law is that of the state with the greatest interest in governing the particular issue. *See, e.g., White v. Smith*, 398 F.Supp. 130, 134 (D.N.J.1975); *McSwain v. McSwain*, 420 Pa. 86, 94, 215 A.2d 677, 682 (1966). Particularly in light of the fact that plaintiffs are New Jersey residents and the repercussions of the alleged injuries were felt here, this Court reiterates its view that New Jersey substantive law governs the plaintiffs' claims for tortious interference with prospective economic advantage. Therefore, in determining whether the plaintiff provided sufficient evidence to withstand the motion for J.N.O.V., this Court looks to New Jersey law to determine the necessary elements of the claim.

■ The New Jersey courts have relied on the *Restatement (Second) Torts* for the definition of the cause of action. (*See e.g. Norwood Easthill Assoc. v. N.E. Watch*, 222 N.J.Super. 378, 385, 536 A.2d 1317 (App.Div.1988)). In the present matter, the relevant Restatement section is § 766B:

> **§ 766B Intentional Interference with Prospective Contractual Relation**
>
> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

The cause of action requires a tripartite situation wherein a third party intentionally and improperly interferes with a rela-

tionship between two other parties, from which relationship the complaining party reasonably expected to receive economic benefit. *Borbely v. Nationwide Mutual Insurance Co.*, 547 F.Supp. 959, 976 (D.N.J.1981). Thus, the elements which the plaintiff must prove are (1) that there existed a reasonable expectation of economic advantage or benefit belonging or accruing to the plaintiff; (2) that the defendant knew of such expectancy; (3) that the defendant wrongfully, intentionally interfered therewith; (4) that, in the absence of interference it is reasonably probable the plaintiff would have realized his economic advantage; and (5) that the plaintiff sustained damage as a result thereof (proximate cause and proof of damages). (*See* Jury instructions at 24–25).

■ As suggested by the Restatement, it is no defense to such a claim that the contract interfered with is not enforceable because

> contracts which are voidable by reason of the statute of frauds, formal defects, lack of consideration, lack of materiality, or even uncertainty of terms, still afford a basis for a tort action when the defendant interferes with their performance.

*Harris v. Perl*, 41 N.J. 455, 461, 197 A.2d 359 (1964) (citing Prosser, *Torts* § 106 at 726 (2d ed. 1955)). Thus, for example, the *Harris* Court determined that a buyer was responsible for tortious interference with prospective economic advantage to the broker even where no broker contract had been completed. (*Id.* at 462, 197 A.2d 359). The Court said that "[t]he economic facts and the expectations of fair men with respect to real estate brokerage are clear enough. The role of the broker is to bring buyer and seller together at terms agreeable to both, and both know the broker expects to earn a commission from the seller if he succeeds." (*Id.*) That expectation was therefore protected.

Although there is a cause of action for tortious interference with respect to an unenforceable contract in some situations, this rule is not without limitations. These limitations depend on the nature of the relationship with which the defendant inter-

fered. For example, in *Borbely*, the court granted the defendant's motion for J.N.O.V. on plaintiff's tortious interference claim because it determined that the contracts in question were terminable at will. Since the defendant had the right to terminate them at will, it could not be said that termination was wrongful. (547 F.Supp. at 976).

Prosser has also identified some of the limitations on the claim:

> Virtually any type of contract is sufficient as the foundation of an action for procuring its breach. It must of course be valid, in force and effect, and *not illegal as in restraint of trade, or otherwise opposed to public policy*, so that the law will not aid in upholding it.

(Prosser, *Torts*, § 129 at 994 (5th ed. 1984)) (emphasis added). In other words, that a contract is unenforceable is not a bar to a tortious interference claim, but that a contract is invalid as opposed to public policy is. As one court faced with a contract void due to violation of a licensing statute put it, plaintiff's "analogy to the statute of frauds is not apt, for that statute does not make the transaction illegal for lack of writing but merely denies the aid of the court in enforcing it." *Tanenbaum v. Sylvan Builders, Inc.*, 50 N.J.Super. 342, 355, 142 A.2d 247 (App.Div.1958), *modified on other grounds*, 29 N.J. 63, 148 A.2d 176 (1959). This is as it should be, because the reason that the law protects otherwise unenforceable contracts from tortious interference is that "[i]n a civilized community, which recognizes the right of private property among its institutions, the notion is intolerable that a man should be protected by the law in the enjoyment of property once it is acquired, but left unprotected by the law in his efforts to acquire it." (*Harris*, 41 N.J. at 462, 197 A.2d 359) (quoting *Brennan v. United Hatters of North America*, 73 N.J.L. 729, 65 A. 165 (E. & A.1906)). This policy is not served where the contract is illegal or void as against public policy.

Prosser further explains the policy behind allowing recovery for tortious interference with prospective economic advan-

tage: "[i]n such cases there is a background of business experience on the basis of which it is possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered." (Prosser, *Torts*, § 130 at 1006 (5th ed. 1984)).

Thus, although not required to prove that their relationship with Stern was an enforceable contract, TINS and Fineman had to prove that they had a reasonable expectation of economic advantage arising from that relationship. As the comments to the Restatement say, "[t]he relations protected against intentional interference ... include any prospective contractual relations ... *if the potential contract would be of pecuniary value to the plaintiff.*" (*Restatement (Second) Torts* § 766B, Comment c) (emphasis added). As a matter of law, this requirement was not met in the present matter, because of the impact of the Connecticut Act.

■ The relationship between Stern and plaintiffs may be characterized as a prospective contract. Accordingly, if the question before the Court was its validity as between Stern and plaintiffs, this Court would apply Connecticut law because in contract cases, New Jersey courts apply the law of the place where the contract is made, "unless the dominant and significant relationship of another state to the parties and the underlying issues dictates that this basic rule should yield." *Ramsbottom v. First Pennsylvania Bank*, 718 F.Supp. 405, 407 (D.N.J.1989) (quoting *State Farm Mutual Auto. Ins. Co. v. Estate of Simmons*, 84 N.J. 28, 37, 417 A.2d 488 (1980)); *see also McFadden v. Burton*, 645 F.Supp. 457, 465 (E.D.Pa.1986). The assessment of the significant relationship should "encompass an evaluation of important state contacts as well as a consideration of the state policies affected by, and governmental interest in, the outcome of the controversy." *Ramsbottom*, 718 F.Supp. at 407 (quoting *State Farm*, 84 N.J. at 37, 417 A.2d 488). Under this analysis, Connecticut law would apply to determine the validity of the "Letter of Intent" primarily because it was to be fully performed there, but more importantly, because Connecticut's law concerning business opportunities represents the dominant and significant policy of protecting its residents in commercial dealings.

This Court has already determined that Connecticut law does not apply to determine the rights and liabilities as between Armstrong and plaintiffs. However, the reasonable expectation of economic advantage arising from the Stern–TINS relationship necessarily requires this Court to consider the nature of that relationship, under the law which governed it: that of Connecticut. This requires a careful scrutiny of the Connecticut Act, relied upon by Stern's counsel in declaring void Stern's prospective relationship with TINS, and upon which Armstrong relies in support of one aspect of its motion for J.N.O.V.

The Connecticut Act, Conn.Gen.Stat. § 36–503 *et seq.*, was enacted to police business opportunities which are characterized by "high pressure salesmen who flash in and out of motel rooms and are gone before the investor knows he's been fleeced." Woolf [6], *The Connecticut Business Opportunity Investment Act: An Overview*, 54 Conn.B.Journ. 415, 416 (1980) (quoting 12 *Continental Franchises Rev.* No. 10 at 1 and 2 (June 11, 1979)).[7]

Mr. Woolf described the Act as follows:

---

**6.** At the time of publication of the article, Brian J. Woolf was Counsel and Executive Assistant to the Connecticut Banking Commissioner, although the article expressly states that the "opinions expressed herein are those of the author alone." Woolf later became Banking Commissioner.

**7.** This view of the Connecticut Act is particularly appropriate in light of the practices of Fineman and his sales force. For example, Fineman testified that TINS prepared a script for all his salespeople (Tr. 6.126) which reflected his psychology of selling. (See *generally* Tr. 6.144–6.158). This psychology includes his view that the relationship between buyer and seller is a "war", (Tr. 6.157), in which his own salespeople "were killers." (Tr. 6.162). This kind of sales technique and attitude make it difficult for the prospective purchaser to adequately assess the item being sold and the nature of the promoting company.

In general, the Act requires sellers who plan to sell business opportunity investment programs to register such programs with the banking commissioner. Sellers of business opportunity investment programs are also required to provide prospective purchaser-investors with information necessary to make an informed decision before they make payment to the seller. In certain circumstances, sellers of these programs are also required to represent that the purchaser-investor's investments are secured in such a way as to actually provide security in the form of a bond or trust account. Finally, the Act prohibits representations which tend to mislead prospective purchaser-investors.

(*Id.*) (footnote omitted).

The Connecticut Act applies to "sellers" of "business opportunities." The Act defines "seller" as "a person who is engaged in the business of selling or offering for sale business opportunities." (§ 36–504(4)). The definition of "business opportunity" is, in relevant part:

(6) "Business opportunity" means the sale or lease, or offer for sale or lease of any products, equipment, supplies or services which are sold or offered for sale to the purchaser-investor for the purpose of enabling the purchaser-investor to start a business, and in which the seller represents

\* \* \* \* \* \*

(C) that the seller guarantees, either conditionally or unconditionally, that the purchaser-investor will derive income from the business opportunity; or that the seller will refund all or part of the price paid for the business opportunity, or repurchase any of the products, equipment, supplies or chattels supplied by the seller, if the purchaser-investor is unsatisfied with the business opportunity; or

(D) that the seller will provide a sales program or marketing program to the purchaser-investor.

(§ 36–504(6)).

TINS' presentation brochure, coupled with the Letter of Intent, described above,

make it clear that the distributorship arrangement for sale of the video magazine is within parts (C) and (D) of the definition. First, TINS guaranteed bonuses upon sales, (*see* Px. 8001 at 18), and represented particular figures which Stern would earn if it signed up as a distributor. (*See e.g.* Tr. 2.100–101 (Fineman)).

Second, TINS' training program is a marketing program within part (D), as is clear from the stated goals:

1. Train Distributor Sales Personnel to effectively present and close a promotional offering such as TINS.

2. Train the sales force in successful sales techniques which they will utilize in their day-to-day business dealings to produce dramatically improved results.

(TINS' brochure, Exh. Px. 8001 at 15).

The plaintiffs, however, argue that becoming a TINS distributor did not enable Stern to "start a business," thus TINS is not a seller within the meaning of the Act. (Plaintiffs' Opp. at 9). Relying on *Eye Associates, P.C. v. IncomRx Systems, Ltd.,* 912 F.2d 23 (2d Cir.1990), plaintiffs argue that whether or not the TINS program was offered to start a business is a question of fact concerning the intent of the parties, about which there is no evidence. The plaintiffs' reliance is misplaced. The *Eye Associates* court, on appeal from a grant of summary judgment, reviewed the contract and other evidence to determine whether any issues remained. Based on such evidence, the court determined that such issues did remain and so remanded the matter. The court did not hold, as plaintiffs herein suggest, that intent fully governs the question of whether or not the TINS program was offered to "start a business."

In fact, Banking Commissioner Woolf has stated that:

[I]f the purchaser-investor is in an already existing business, the Act would not apply. It should be noted, however, that the "existing business" concept should not be construed too broadly. In the author's opinion [8], the sale of the

8. This opinion was, at the time, that of only an

author, but since he is now Banking Commis-

products, equipment, etc. to a purchaser-investor of an existing business must not substantially change, modify or add to the lines of products, equipment, etc., carried by the purchaser-investor. Any substantial changes, modifications or additions should be construed so as to preclude one from relying upon the "existing business" concept because of the substantive change in the nature of the business.

Woolf, *supra* at 419.

The plaintiff is also in error concerning the evidence in this case. There is considerable evidence showing that the TINS program was supposed to be extremely beneficial, in Elliot Fineman's estimation, to Stern by *both* increasing floor covering sales *and* generating income from the sale of products entirely new to Stern: subscriptions to the video magazine, televisions and videocassette recorders. (*See e.g.* Tr. 2.59–2.60 (Fineman)).[9] It is significant, too, that the majority of such evidence comes from the plaintiff Elliot Fineman himself. Thus, under the most reasonable definition of "new business," the TINS program constituted a completely new line of business: the sale of a monthly video magazine for floor covering retailers and the sale of equipment related thereto.

It has been held that the right to sell and market aircraft is a "new business" although the purchaser was already in the business of selling other kinds of transportation vehicles. (*See Eye Associates,* 912 F.2d at 27 (citing State of Connecticut, Office of the Banking Commissioner, Interpretive Opinion *In re Suma, Incorporated,* March 25, 1982)).

■ The evidence adduced at trial makes it clear that Armstrong met its burden of showing that TINS is within the Connecticut Act. The evidence provided by the plaintiffs in particular shows that its distributorship arrangement with Stern would enable the purchaser to modify an existing business in a substantial manner, require a payment of more than $100, and provide a sales or marketing program which would enable the purchaser to derive a profit. (Woolf, *supra* at 420). Thus, the TINS program is a "business opportunity" within the meaning of the Connecticut Act, §§ 36–504(6)(C), (D).

■ Overall, the plaintiffs misconstrue the burden of proof in this matter. It was their burden to prove that they had a reasonable expectation of economic advantage in their relationship with Stern, not the defendant's burden to prove that the plaintiffs did not. The defendant made it clear that the Stern–TINS relationship, and the claims against it, were void as a result of the Connecticut Act. Arguing that the evidence at trial irrefutably established that the Connecticut Act was applicable and barred plaintiffs' tortious interference claims, Armstrong moved to dismiss at the close of all the evidence, based on that statute. At that point it was incumbent upon the plaintiffs to seek to reopen their case to overcome such a showing, if they were truly surprised by the motion. No such application was made. The question herein is whether the *plaintiffs* have succeeded in overcoming the application of the Connecticut Act.

■ Plaintiffs' other arguments concerning this issue are unavailing. For example, plaintiffs argue that TINS was not a seller within the meaning of the statute because it offered its program to only one investor in Connecticut. (Plaintiffs' Opp. at 10). This argument is specious in light of the uncontroverted evidence that TINS in fact sold its programs to other investors across the country. Restricting the definition of "seller" to one who sells more than one program within the State is unreasonable in light of the statute's avowed purpose of protecting buyers. Under plaintiffs' interpretation, a party could avoid application of the statute by selling to only

---

sioner, this opinion has been specifically attributed to the Commissioner. (See *e.g. Eye Associates,* 912 F.2d at 27.)

**9.** Indeed, Fineman characterized TINS as a "brand new concept," which was "revolutionary" (Tr. 6.154), thus showing that it was a new and different business from the sale of floor covering itself.

one investor in the state on an "exclusive" basis, thus leaving the investor beyond the protection of the statute. This is an unreasonable interpretation of the statute, and this Court will not adopt it in the absence of direction from the Connecticut courts.[10]

■ Plaintiffs also argue that it is not clear whether TINS' distributorship arrangement for sale of video magazine subscriptions constitutes a "sales program" or "marketing program" within the Act. Plaintiffs rely on the fact that there is no definition within the Act, requiring instead a case by case analysis. (*See Eye Associates*, 912 F.2d at 28 (citations to legislative history and interpretative statements that the determination is based on a case by case analysis)). However broad or narrow the definition may be, it is beyond contention that one of the avowed benefits of becoming a TINS distributor was its sales training program as described in its brochure. (*See* above). This program is clearly a "sales" or "marketing" program, as described by the plaintiffs themselves. Furthermore, the video magazine played in open court demonstrates that it is a program designed to enhance the distributor's sales and marketing with its retailers.

Plaintiffs also argue that Armstrong did not prove that TINS failed to comply with the Connecticut Act. Probative evidence on this question comes from the June 29, 1984 letter from Stern's counsel stating that TINS failed to register and therefore its breach of contract claims were not valid. (Dx. 1003). Contrary to the plaintiffs' assertion, this letter was admitted into evidence without any restrictions as to its use, and without objection from plaintiffs' counsel. (*See* Tr. 7.123). Furthermore, Mr. Fineman testified as follows concerning the letter:

Q: Do you recall Stern, for its part, had some claims against you?

A: No, Stern had no claims against us. Their attorney came up with some kind of law that Connecticut required TINS or any company that fell in our category to get some kind of clearing with the banking commissioner ...

\* \* \* \* \* \*

Q: Apart from whether you agreed with [your attorney] or not, Mr. Fineman, the question is, did the Stern's company assert any claims?

A: They asserted a claim that [I] wasn't supposed to ask them to join the TINS network. That was their claim until I filed something with the banking commissioner.

(Tr. 7.122:1–6; 7.122:13–17). The only reasonable inference from such testimony is that Mr. Fineman did not in fact file or "get some kind of clearing" with the Banking Commissioner. Once again, defendant having introduced such evidence demonstrating that TINS did not register, it was up to the plaintiffs to show that TINS did in fact comply with the Connecticut statutory requirements. They introduced *no* evidence of such compliance.

Plaintiffs' assertion that Stern is exempted from the Connecticut requirements by virtue of its size (over $1 million net worth) is also without merit. The statute includes its own burden of proof: "In any proceeding under this subsection, the burden of proving an exemption is upon the person claiming it." (§ 36–508(e)(5)). In the present matter, the only evidence concerning Stern's net worth came from Armstrong's concerns that Stern was inadequately capitalized. (*See e.g.* Tr. 24.15–24.17 (testimony of Armstrong's credit manager)). Plaintiffs failed to prove otherwise, and failed to seek to reopen their case in order to do so. Indeed, in attempting to prove that Armstrong controlled Stern, plaintiffs went to considerable lengths to prove that Stern was actually in financial

---

10. In Eye Associates, apparently the only case interpreting the Connecticut Act, the court noted that "the Act does not clearly state that companies selling a single business opportunity are exempt from its coverage. On remand, therefore, the district court will have to determine whether the sale of a single business opportuni-ty brings the seller within the reach of the statute." (912 F.2d at 26). Accordingly, it is entirely appropriate for this Court to consider the relevant information to determine whether a party is within the statute when it only offers one opportunity within the State.

trouble. (*See e.g.* Px 5009 (Armstrong's Risk Account Analysis, Aug. 15, 1984); Px 5012 (same, Nov. 16, 1984)).

Finally, this Court should address the plaintiffs' argument that this motion should be denied because Armstrong, as a third party, cannot assert Stern's rights under the Connecticut Act. (Plaintiffs' Opp. at 19–21). Plaintiffs miss the point. The defendant is not asserting Stern's rights under the Act; indeed, Stern asserted and exercised its own rights in counsel's letter of June 29, 1984. Rather, defendant has argued, and this Court finds, that the existence of the Connecticut Act, the June 29 letter, and the other evidence cited above renders any expectation of profit from the Stern–TINS relationship unreasonable as a matter of law. The issue is not whether Armstrong was "privileged" to interfere with this void, illegal relationship. Rather, plaintiffs have failed to meet their burden of proving that the relationship engendered any reasonable expectation of economic advantage.

Thus, the Connecticut Act applied to TINS on its face, and TINS failed to take steps to comply with the requirements of the Act. These requirements are particularly interesting in light of the evidence revealed in this case. Section 36–508 of the Act imposes registration and financial disclosure requirements before a business opportunity may be presented in Connecticut. The financial information which must be provided is substantial:

> (b) The seller shall file with the commissioner (1) a balance sheet, income statement and statement of changes in financial condition of such seller as of a date not more than four months prior to the filing of the registration statement (2) a balance sheet of such seller, an income statement and statement of changes in financial position for the most recent fiscal year audited by an independent public accountant or an independent certified public accountant and (3) a balance sheet and income statement and statement of changes in financial position for the prior two fiscal years reviewed by an independent certified public accountant who provides an opinion stating that he is not aware of any material modifications that should be made to the financial statements in order for them to be in conformity with generally accepted accounting principles. If any material changes in the financial condition of such seller occur after such statements are prepared, such seller shall disclose such changes and explain their significance to the operation of a business opportunity.

(Conn.Gen.St. § 36–508(b)).

Furthermore, § 36–506 requires that the seller provide substantial information directly to the purchaser-investor, including (but not limited to) information about past business conduct, personal conduct (bankruptcy and criminal) of those involved in the venture, clear descriptions of the method by which the funds to be earned by the purchaser were calculated, numbers of prior business opportunities sold by the seller and the names and addresses of such buyers, information about whether such purchasers voluntarily terminated the arrangement, *and* a copy of the financial statement required to be filed under § 36–508. In addition, the document provided to the seller, at least ten days prior to signing a contract or exchange of money, must include the following:

> (27) A section entitled "risk factors" containing a series of short concise captioned paragraphs summarizing the principal factors which make the business opportunity one of high risk or of a speculative nature. Such factors shall include, but not be limited to: The absence of profitable operations within the previous three years; an erratic financial position of the seller; the particular nature of the business in which the seller is engaged or proposes to engage; any adverse background information regarding executive officers and directors of the seller, including prior business failures, criminal convictions or personal adjudications of bankruptcy; limited experience or lack of experience of the seller's management with respect to the particular business; and the identity and relationship to the seller of any customers, the loss of any one of whom would have

a material adverse effect on the seller. Where appropriate, reference shall be made to other sections of the disclosure document where more detailed information has been disclosed.

(Conn.Gen.St. § 36–506(b)(27)).

The considerable reporting requirements of the Connecticut Act clearly show that the Legislature was concerned with "fly-by-night" operations who arrived in the state, coerced funds from Connecticut businesses, and then folded or otherwise became unable to perform. This policy compels this Court to the conclusion that not only is TINS literally within the language of the Act, but application of the Act to TINS serves such policies.

TINS was exactly the sort of operation which the Connecticut legislature was interested in policing. As indicated above, the theory of the plaintiffs' case is that TINS was in a financially troubled situation at the time that Stern backed out of the Letter of Intent, such that losing Stern caused the entire company to fold. Furthermore, Fineman testified rather extensively that he never revealed his company's financial position to prospective buyers of the video magazine. (*See e.g.* Tr. 7.35–7.36 ("The last thing I would have done on any sales call would be to discuss with a prospective customer what our business plans were, our financial condition was, what the state of our situation was.")) This position, though callous and deceptive, is certainly understandable in light of TINS' substantial operating losses for the first five months of 1984, and its deficit position in the amount of $739,346 as of May 31, 1984. (Dx. 127, prepared by TINS' accountants, Seiden & Thaler, C.P.A.s, on June 22, 1984). Revelation of such information might well have caused Stern to reconsider entering a long-term relationship with TINS, since such a relationship necessarily depended upon the survival of TINS, particularly

TINS' ability to bear the considerable expense of producing the monthly video magazine on which Stern would risk its reputation with *its* retailers. More importantly, Stern had a statutory right to this information. Therefore, this Court finds that either a Connecticut or New Jersey state court faced with the present issue would determine that TINS was within the scope of the Connecticut Act.[11]

The evidence is beyond contention that TINS did not comply with the Connecticut Act, although required to do so. Since it failed to register, this plaintiff was prohibited by § 36–510 from making sales and committing other acts:

> *No person shall* in connection with the sale or offer for sale of a business opportunity: (1) *Sell or offer for sale* a business opportunity in this state or from this state unless it has first been registered with the commissioner and declared effective by the commissioner in accordance with the provisions of section 36–505; (2) *represent that the business opportunity will provide income or earning potential of any kind* unless the seller has documented data to substantiate the claims of income or earnings potential and discloses this data to the prospective purchaser-investor at the time such representations are made; ... (5) make any claim or representation in advertising or promotional material, or in any oral sales presentation, solicitation or discussion between the seller and a prospective purchaser-investor, which is inconsistent with the information required to be disclosed by this chapter; (6) directly or indirectly (A) employ any device, scheme or artifice to defraud, (B) make any untrue statement of material fact or *omit to state a material fact necessary in order to make the statements made, in the light of the circum-*

---

11. Indeed, the plaintiffs' desperate arguments to the contrary only demonstrate that TINS is indeed within the scope of that Act. (See Plaintiffs' Opp. at 16). Plaintiffs assert that sellers have "significant rights" under the Act, referring to a statute of limitations and a clause requiring the purchaser to return the seller's goods upon declaring a contract void. (*Id.*) Neither of these "rights" bears any relevance to the present matter. Stern voided the Letter of Intent only five weeks after signing it and asserted its claims at that time. Furthermore, Stern had received no video magazines from TINS at the time it canceled, and had in fact spent its own money acquiring televisions and VCR's which it later had to get rid of.

*stances under which they are made, not misleading,* or (C) engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

(Conn.Gen.Stat. § 36–510(1), (2), (5), (6)) (emphasis added).

There are several effects of acting in contravention of the Act, the most important of which is that the purchaser-investor may, within one year of the date of the contract with the seller, declare that contract void:

If a business opportunity seller ... fails to give the proper disclosures in the manner required by section 36–506 ... then within one year of the date of the contract, upon written notice to such business opportunity seller, the purchaser-investor may void the contract and shall be entitled to receive from such business opportunity seller all sums paid to such business opportunity seller.

(Conn.Gen.Stat. § 36–517(a)).[12]

This is precisely what Stern did in its counsel's letter of June 29, 1984, as described above. Thus, the contract between Stern and TINS was void under the Act. This Court could, at this point, end this discussion. The underlying relationship between Stern and TINS was void by reason of the Connecticut Act pursuant to the stated policies of that State. Accordingly, as a matter of law, there was no reasonable expectation of profit from this relationship, so it cannot form the basis for tortious interference claims. Thus, the de-

fendant is entitled to judgment notwithstanding the verdict on these claims.

However, there are several additional considerations which further support this Court's determination: policies particularly relevant to the case at bar.

Specifically, the Connecticut Act provides:

(h) *No person who has made or engaged in the performance of any contract in violation of any provision of this chapter* or any regulation or order adopted or issued under this chapter, or who has acquired any purported right under such contract with knowledge of the facts by reason of which its making or performance was in violation, *may base any cause of action on the contract.*

(Conn.Gen.Stat. § 36–517(h)) (emphasis added). Thus, since TINS acted in violation of the Connecticut Act, the plaintiffs' present action for interference with the relationship arising from said violation is specifically prohibited by the Act.[13]

In this regard, it should be noted that the plaintiffs' argument distinguishing void and voidable contracts is not applicable in the present situation. The Connecticut Act specifically treats a contract voided at the option of the buyer as a void contract by eliminating all claims based thereon.[14] This treatment serves the purposes of the Act, and is consistent with the policies applicable in New Jersey as well, as indicated below.

At this point, it should be reiterated that an illegal contract must be distinguished from a merely unenforceable one. As

---

**12.** Contrary to the plaintiffs' assertion, there is no scienter requirement on the part of the seller before the purchaser may declare the contract void. (See § 36–517(a)). Under § 36–517(h), the scienter requirement applies only in the situation involving acquisition of a contract right created in violation of the statute. (*See* discussion *infra* regarding § 36–517(h)). Thus, it is inapplicable to the present situation. Scienter is required, however, before fines may be imposed upon a seller who acts in contravention of the statute. (*See* § 36–516, which is also inapplicable to the present matter.)

Similarly, plaintiffs do not even allege that the motivation of Stern in terminating the Letter of Intent is important or relevant to the application or effect of the Connecticut Act.

This argument would have failed had the plaintiffs advanced it because the Act is directed to the *seller's* acts, not the purchaser-investor's.

**13.** If a consummated contract may not be so enforced under this statute, necessarily a prospective economic relationship could not be. That is, TINS could not have sued to force Stern to execute and perform its distributorship agreement.

**14.** Plaintiffs' suggestion that the registration requirements of the Connecticut Act violate first amendment rights of free speech (Plaintiffs' Opp. at 16) is so specious as to require no further comment.

Prosser suggests, those which are unenforceable due to defects such as the statute of frauds may nonetheless form the basis of a tortious interference claim. In contrast, an illegal contract, or one that is against public policy, should not form the basis of such a claim because allowing the tortious interference claim is akin to recognizing the contract. In the present matter, application of the Connecticut Act to the Stern–TINS relationship renders the relationship illegal. Indeed, the Second Circuit's interpretation of *Tanenbaum* succinctly captures the distinction to be made here:

> [I]t is not accurate to say that the court denies enforcement of an otherwise valid agreement, as with the statute of frauds, for the New Jersey courts have distinguished the licensing act from the statute of frauds on the basis of the *underlying illegality of conduct* in violation of the former.

*Weston Funding Corp. v. Lafayette Towers*, 550 F.2d 710, 714 (2d Cir.1977) (emphasis added) (citing *Tanenbaum*, 50 N.J.Super. at 355, 142 A.2d 247, *modified in other respects*, 29 N.J. 63, 148 A.2d 176). Thus, plaintiffs' reliance on this Court's earlier opinion and its jury instructions that an unenforceable contract may form the basis of a tort claim is misplaced.[15]

■■■ This Court, sitting in diversity as to plaintiffs' tortious interference claim, must determine how a New Jersey court would respond to the present circumstances regarding the Connecticut Act. It is this Court's opinion that a New Jersey court would enforce the policies embodied in the Connecticut Act, including that represented by § 36–517(h), and rule as a matter of law that plaintiffs' tort claims are prohibited. In other words, a party who cannot sue for tortious interference with a void relationship in Connecticut may not do so by fortuitously filing its lawsuit in New Jersey.

It is a well-accepted principle of contract law that

the illegality of a contract is to be determined by the law of the place of contract. *If that law makes the contract itself illegal, of course, it is void everywhere.*

*Staedler v. Staedler*, 6 N.J. 380, 389, 78 A.2d 896 (1951) (emphasis added). *See also Louis Schlesinger Company v. Kresge Foundation*, 312 F.Supp. 1011, 1028 (D.N.J.1970) (same); *Design–4 v. Masen Mountainside Inn., Inc.*, 148 N.J.Super. 290, 293, 372 A.2d 640 (App.Div.), *certif. denied*, 75 N.J. 6, 379 A.2d 237 (1977) ("Generally, the law will not assist either party to an illegal contract; the law leaves the parties where it finds them"). Thus, the courts of New Jersey will refuse to enforce illegal or void contracts, including in situations where, as here, the contract is void as a result of a failure to comply with a registration or licensing requirement. *See e.g. Accountemps v. Birch Tree Group*, 115 N.J. 614, 560 A.2d 663 (1989); *Stack v. P.G. Garage, Inc.*, 7 N.J. 118, 121–122, 80 A.2d 545 (1951) (unlicensed practice of law); *Gionti v. Crown Motor Freight Co.*, 128 N.J.L. 407, 411, 26 A.2d 282 (1942) (unlicensed architect); *Design–4*, 148 N.J.Super. at 293, 372 A.2d 640 (unlicensed architect); *Tanenbaum v. Sylvan Builders, Inc.*, 50 N.J.Super. 342, 354, 142 A.2d 247 (App.Div.1958) (unlicensed real estate broker); *Nitta v. Yamamoto*, 31 N.J.Super. 578, 584, 107 A.2d 515 (App.Div.1954) (unlicensed employment agency); *Solomon v. Goldberg*, 11 N.J.Super. 69, 75, 78 A.2d 118 (App.Div.1950) (unlicensed real estate broker); *accord Restatement (Second) Contracts*, § 181 (1979); 6A Corbin, *Corbin on Contracts*, § 1512 (1962). Indeed, Connecticut follows the same principle. *See e.g. Douglas v. Smulski*, 20 Conn.Sup. 236, 238, 131 A.2d 225, 226 (Super.Ct.1957) (contract for architectural services made by an unlicensed architect is "illegal and void as against public policy") (citing *Gionti*, 128 N.J.L. at 411, 26 A.2d 282).

■■■ Not only will the courts of New Jersey refuse to enforce an illegal or void

---

**15.** Furthermore, this Court is not bound by its summary judgment opinion to the extent that it denied the motion based on the available evidence. That opinion was based on a review of some of the evidence only to determine whether a jury question might exist. The proofs at trial were not identical, and so may support different conclusions.

contract, they will not permit a party to such a contract to sue for interference therewith. For example, in *Tanenbaum*, 50 N.J.Super. 342, 142 A.2d 247, the Appellate Division considered the plaintiff's tortious interference claim based upon a broker's "contract." The plaintiff, however, was not properly licensed and therefore was specifically precluded by statute from enforcing any contract for commissions. In refusing to allow the plaintiff to seek damages against a third party for tortious interference with such a contract, the Court stated that:

> The licensing statute ... represents the public policy of the State, and is not merely a regulation of private property law. The court will prohibit its circumvention by denying relief in any case where the effect, direct or indirect, of allowing an action would be to recognize a transaction consummated in violation of the statutory provision.

(*Id.* at 355, 142 A.2d 247). Thus, the Court determined that allowing a claim for tortious interference based on a void contract would serve to recognize the void contract, a position which is contrary to the stated public policy of New Jersey. *See also Associates Financial v. Bozzarello*, 168 N.J.Super. 211, 214, 402 A.2d 942 (App.Div. 1979) ("The express legislative intent [in requiring foreign corporations to register] was to deny to foreign corporations which decline to candidly report their activities in this State ... the use of our courts to enforce their rights. Plaintiff and its assignor cannot evade this clearly expressed legislative purpose by the wily formality of an assignment of a contract or cause of action.")

New Jersey does not have a statute which is the same as Connecticut's Business Opportunity Investment Act. However, the policies embodied in Connecticut's statute, protecting the consumer from financially unstable sellers presenting slickly packaged programs to sales targets, are not foreign to New Jersey. *See e.g.* N.J.S.A. 45:15–16.27 *et seq.* (The Real Estate Sales Full Disclosure Act, regulating promotional plans to sell land outside New Jersey to New Jersey residents); N.J.S.A.

14A:13–11 ("No foreign corporation transacting business in this State without a certificate of authority shall maintain any action or proceeding in any court of this State"); N.J.S.A. 14A:13–14 *et seq.* (Corporation Business Activities Reporting Act, requiring reporting to the state with violations resulting in closed access to the courts); N.J.S.A. 17:16A–1 *et seq.* (Reporting and licensing requirements for investment companies, violation prohibits transactions and is a misdemeanor).

Thus, enforcing the Connecticut Act by disallowing the plaintiffs' claims for tortious interference herein is consistent with stated policies of New Jersey. Accordingly, this Court determines not only that the Connecticut Act's terms result in a failure of proof on an essential element of plaintiffs' claims, but that the courts of New Jersey would enforce the policies embodied in that Act. Armstrong is entitled to judgment notwithstanding the verdict on TINS' and Fineman's claims for tortious interference with the relationship or prospective relationship with Stern.

### C. *Plaintiffs' Tort Claims: Insufficient Evidence*

■ Even if this Court found that the Connecticut Act did not bar plaintiffs' claims, it would grant the defendant's motion for J.N.O.V. for insufficiency of the evidence. This Court has already summarized the relevant legal requirements for proving a claim of tortious interference. The evidence, even viewed most favorably towards the plaintiff, is critically deficient with respect to two of these elements: wrongful conduct and proximate cause.

#### 1. Wrongful Conduct

In order for conduct to be "wrongful" there must be proof of "malice." *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 588, 175 A. 62 (1934) (citing *Temperton v. Russel*, 1 Q.B. 715, 728). Malice as an element of this tort is defined as the intentional doing of an act without justification or

excuse.[16] *Printing Mart v. Sharp Electronics,* 116 N.J. 739, 752, 563 A.2d 31 (1989) (citing *Rainier's Dairies v. Raritan Valley Farms, Inc.,* 19 N.J. 552, 563, 117 A.2d 889 (1955)); *see also Louis Kamm, Inc.,* 113 N.J.L. at 588, 175 A. 62 (same).

In the present matter, no reasonable and rational juror could have determined that Armstrong acted wrongfully from the evidence shown by the plaintiffs. The picture which the plaintiffs painted at trial bears no resemblance to a portrait of reality, and was not created as an appeal to reason and objectivity from the jurors. Rather, plaintiffs, with trial counsel as their chief artist, created a surreal collage from detached, isolated events which they tortured and twisted in a calculated appeal to passion, fantasy, conjecture and sympathy rather than reason. The core of the plaintiffs' case is the extraction of single words, phrases and incidents taken out of context, and the recasting of them in unreasonable shapes.

Plaintiffs place considerable emphasis on one question and one answer arising at the deposition of Robert Roth taken on July 15, 1985. That question and answer relate to one small segment of a three-hour business meeting, on June 7, 1984, attended by Mr. Roth and Mr. Guzinsky of Armstrong, and Alan Abrahamson (President of Stern): Roth's response to Abrahamson's statement that Stern had agreed to become a TINS distributor. The excerpt reads as follows:

> Q. Did you say to him Alan, I don't think this makes a lot of sense in the Armstrong scheme of things, given the fact that we do have our own video program that can help you increase your profitability, that type of thing?
>
> A. That's probably what I said because we have an overlap program.

(Tr. 9.171:11–17). Based on this question and answer, plaintiffs argue that Armstrong maliciously and intentionally "scuttled" the TINS–Stern relationship by forcing Stern to withdraw.

This single question and answer, however, was plucked out of context. It appeared at the end of 15 pages in the deposition (all of which was read into the record at the trial) beginning at Tr. 9.157. A reasoned review and analysis of that entire conversation certainly will not support the argument that here was Roth insidiously, intentionally and maliciously planting in Abrahamson's mind the implied threat that big troubles lay ahead for him with Armstrong if he continued in the TINS program. Upon being confronted in the deposition with Humphrey's memorandum of September 12, 1983 (Px. 165) and being asked if he had acted consistent with that memorandum in discussing the subject of TINS with Abrahamson, Roth replied:

> But it's after the fact. He signed up for the program. The program is his. There was no discouragement on my part. He has the program.

(Tr. 9.162:13–15). Once again, on the same subject:

> Q. Did you follow Mr. Humphrey's instructions to discourage your wholesalers' participation?
>
> A. Alan had signed up for the program. Alan was a TINS distributor. It's a fait accompli. It's done.

(Tr. 9.163:16–22).

Furthermore, the excerpt of the Roth deposition read into the record by plaintiffs' counsel does not reveal any reaction from Abrahamson to Roth's comments about TINS. That subject was addressed, however, when Roth testified live before the jury. After repeating, to the jury, that he had expressed surprise that Stern had signed up for TINS because he believed

---

**16.** The malice standard that applies to tortious interference with a prospective contract is less stringent than that required for punitive damages despite the fact that the word "malice" is used for both. As more fully described below, punitive damages may be awarded in New Jersey only where the conduct of the defendant is "particularly egregious." *Fischer v. Johns-Manville Corp.,* 103 N.J. 643, 654–55, 512 A.2d 466 (1986). *See also Leimgruber v. Claridge Assoc. Ltd.,* 73 N.J. 450, 454, 375 A.2d 652 (1977). Compare the Court's Jury Instructions at pp. 25 and 46. The use of the term "malice" in this section of the present opinion refers to the lesser standard as an element of the tortious interference claims.

there was an overlap between that program and Armstrong's video dealer training, Roth testified as follows:

Q Did Mr. Abrahamson say anything to you when you expressed this surprise?
A As I recall, I think he made a statement that it would fill in a void that we didn't have something like that.
Q What would fill in the void?
A TINS.
Q Did he explain to you what about TINS he believed would fill a void that Armstrong didn't serve in this nation? Did he say something?
A I can't really be specific. At that time I had never seen a TINS video, so I don't really recall specifically what he said. I know he said that, but specifically I don't.
Q So your best recollection is he said something along those lines?
A Right.
Q TINS does something that the Armstrong program doesn't do?
A Right. I think he said something like that.
Q Did you respond to that comment?
A I don't think so.
Q How was it left? How long did their [sic] discussion about TINS last would you say?
A As I recall, it was a fleeting discussion. We went on to something else.
(Tr. 17.173:2–24)).

This Court is fully aware that the jury, as instructed, was perfectly free to accept certain testimony of Mr. Roth (or any witness) and reject or accord diminished weight to other portions of testimony from the same witness. However, the constant harping at the one question and answer, taken completely out of context, and employing it as the linchpin for supposed conduct by Armstrong so heinous as not only to sustain the tortious interference and antitrust claims but also to support a claim for punitive damages goes far beyond any appeal to reason, objectivity or sound judgment. Regrettably, the rhetoric of plaintiffs' counsel drew the jurors right along with him to an irrational verdict undoubtedly reached in heavy reliance upon the un-

supportable inferences which plaintiffs asked the jurors to draw from this one question and answer in the Roth–Abrahamson conversation of June 7, 1984. It is undisputed that Roth's brief, off-the-cuff remark took place within a conference which lasted several hours. Furthermore, the subject was dropped when Abrahamson said the TINS program would fill a gap in Stern's business. No jury could reasonably infer from this statement that Armstrong acted with any level of malice or intent to harm. Even in the face of the January 1984 Settlement Agreement, no jury could reasonably infer that Roth's brief discussion of TINS (rather than referring Abrahamson to Lancaster) was anything other than inadvertent. The Humphrey memo, written five days after the meeting on June 12, 1984, certainly couldn't have prompted any statement from Roth occurring on June 7. Furthermore, the statement is not itself a threat, does not suggest a threat, and did not take place in a context suggesting a threat. At the very most it was an expression of Armstrong's view (albeit from the wrong source) to which Abrahamson had an appropriate response.

The plaintiffs' fixation on the term "assistance" in the Humphrey memo of June 12 is similarly a flagrant distortion of the evidence. The memo advised all Armstrong district managers "to inform them [Armstrong wholesalers who sought Armstrong promotional assistance for the TINS program] that we are unable to offer any assistance." (Px. 525). The plaintiffs assert that "assistance" means *all promotions*, whether or not related to the TINS magazine. (*See e.g.* Tr. 39.35–36 (Kramer Closing)). Therefore, the plaintiffs assert that the June 12 Humphrey memo created "a sinister code" which effectively barred any new promotions, and "pulled" all existing promotions from those Armstrong dealers who signed up with TINS.

Contrary to such eloquent and emotional arguments, the language of the memo taken in context allows only one reasonable inference, that Armstrong would offer no

promotional assistance applicable only to the TINS magazine system: [17]

> [W]e (Armstrong) are not in a position to evaluate the effectiveness of the TINS program; however, we feel that since all Armstrong wholesalers are not involved in the program, it would be improper for Armstrong to participate in the system. Therefore, if any wholesalers request Armstrong's participation, either on a local level or a national basis, you should inform them that we are unable to offer any assistance. You should make sure that your representatives are not involved in any sales presentations on this system or any other program not provided by Armstrong.

(Px. 525). The entire memo deals only with promotions related to TINS, not all promotions. Therefore this Court holds that no reasonable jury could find that the June 12, 1984 Humphrey memo creates a reasonable inference that Armstrong acted with malice.

The plaintiffs had also attempted to show, in support of their reliance on the June 12 memo regarding assistance, that there were specific promotions which Armstrong "yanked," *i.e.* made unavailable, to Stern upon learning of its Letter of Intent with TINS. These allegations were never supported by the evidence.

John Fischer, Stern's Manager of Armstrong Resilient Sales, testified that, although he told Alan Abrahamson that Armstrong would not make available promotional monies for TINS, he (Fischer) had never specifically discussed the subject of TINS with any Armstrong representative. Fischer's only such discussion in this timeframe had occurred between May 24 and June 7, 1984 in which he had sought a special price on additional Promotional Sundial resilient which he planned to use as an introductory special for TINS subscribers. Fischer also testified that Roth's assistant, Pat Lee, advised him that there was a supply of this product available; however,

that it could not be made available to Fischer at a special price. Fischer testified that he never mentioned the name TINS specifically to Pat Lee.

Consistent with evidentiary principles governing a motion for J.N.O.V., this Court is prepared to assume (as the jury could have found), although contrary to Fischer's testimony, that he did specifically discuss the Promotional Sundial as a potential TINS promotion, and that Lee refused to sell it to him at a discounted price in connection with the TINS program. The Court will also assume, for purposes of the present analysis, that this Promotional Sundial "special" was the fifty-three cent deal which was discussed in the evidence. Nowhere in the record before the Court, either directly or by permissible inference, is there evidence that Armstrong either denied to Stern any promotions or yanked from Stern any promotions previously committed and totally unrelated to Stern's effort to market TINS to the retailers, because of the mere fact that Stern was considering signing up with TINS. The only reasonable (as opposed to emotionally-based or speculative) inference from the considerable testimony on this subject is that Armstrong (whether through Pat Lee, Fischer's conclusion or the Humphrey June 12, 1984 memo) would not provide promotional "assistance" in the form of a discount on an Armstrong product made available only to a distributor for marketing to his retail customers as a TINS-related opportunity. To do so would violate Armstrong's marketing policy by providing a discount on a particular product to one of its distributors but not to another.

Plaintiff's primary witness concerning supposed "yanked" or withdrawn promotions, John Wolfe, understood that the above analysis was all that Fischer and Abrahamson were talking about when this subject was discussed at their meeting with Wolfe, following the sales presentation on June 22, 1984. [18] Wolfe understood that

---

17. TINS was aware that this was Armstrong's position, at least as early as the generation of the January 1984 settlement. It was a position

which plaintiffs own witness (Wolfe) found reasonable and understandable (*infra*).

18. Incidentally, according to Wolfe, Abrahamson had observed, as early as Wednesday morn-

any decision by Armstrong either to withhold or withdraw a promotional opportunity from Stern was linked specifically to the issue of whether that promotion was going to be tied to a TINS sales effort. Moreover, Wolfe testified on direct examination that when this subject was addressed on the evening of Friday, June 22, 1984, his immediate response was that Stern (and Wolfe himself obviously) should not be surprised by this because for Armstrong to make available a promotion to a particular distributor who had signed up with TINS and was going to use the promotion solely in conjunction with marketing the TINS program, would be to favor that distributor over others of Armstrong, in violation of its uniform marketing policy. (Tr. 5.152–5.155). There was no insidious threat here by Armstrong to yank or withhold all "assistance" whether or not related to TINS, in order to coerce Stern into withdrawing from its relationship with the plaintiff company. There is no evidence in the record that such a direct threat was ever made. There is no evidence in the record that in fact Armstrong did pull or yank any promotion or assistance that would otherwise have been available to Stern. Furthermore, Wolfe, TINS' man on the scene, at the time he was confronted with the promotional issue, knew exactly its limited context and so testified before this jury. It was patently unreasonable for plaintiffs to urge their argument on this point and equally unreasonable for the jury to agree. Indeed, both TINS and Fineman himself were aware of Armstrong's position no later than *May 24, 1984,* the day TINS and Stern signed the Letter of Intent. In Wolfe's exact words:

Q Now, in that May 24 meeting with Mr. Abrahamson, you and Mr. Fineman

told Mr. Abrahamson that Armstrong would not reimburse Stern for the 59 cents illustration we have been talking about. Is that correct?

A No, I don't think that is correct, sir. I think that the conversation would have been more general in its nature. I don't recall a specific promotion from Armstrong being discussed. But, again, it would not surprise me at all. That would have been very consistent with our honesty to have lowered expectations of an Armstrong participation.

Q Well, based on your experience at that time, you had no expectation that Armstrong would pay Stern 59 cents under the assumptions that we have been making here on the chart. Is that correct?

A Well, more specifically, that Armstrong would not go out of its way to lend an advantage to one of this [sic] distributors versus another distributor in the same geographical territory.

Q And if Armstrong had paid Stern 59 cents on this promotional Sign–Up Special, and if Nelson and Small was not a TINS distributor, you would no longer have a level playing field up here. Is that right?

MR. KRAMER: Objection to the form of the question.

THE COURT: Objection overruled.

A Yeah, I would say that's correct, sir.

Q Now, Nelson and Small was an Armstrong wholesaler for resilient back in 1984. Is that correct?

A Yes, sir.

Q And I believe you testified yesterday that, correct me if I'm wrong, that it's generally known in the floor covering

---

ing *at the start* of Wolfe's sales presentation to Stern's salesmen, that he was not getting strong promotional support from Armstrong for the types of resilient promotions that he had hoped to run with the TINS program. (Tr. 5.121:13–5.122:3). If Alan Abrahamson were the "Jack Palance" that plaintiffs' counsel made him out to be, concealing a conspiracy with Armstrong and plotting like a "thief" to steal the benefits of the TINS sales presentation, knowing all along that he would not go through with the TINS program because of Armstrong's pressure, can it

reasonably be concluded that he would have made this revelation to Wolfe at the very commencement of the sales training session? Based on this testimony, from plaintiffs' own witness whose veracity they urged vigorously, the inevitable conclusion is NO. While not critical to this Court's adjudication of the present motions, this is but an additional example of the lack of evidentiary support for the contrary conclusion which plaintiffs' counsel urged before the jury with such fervor and colorful imagery.

industry that Armstrong has a level playing field policy for it's—

A I would say absolutely, sir.

Q Very strong policy?

A It's by my experience.

(Tr. 6.16:3–6.17:11). No jury could reasonably accept plaintiffs' rhetoric about Armstrong's actions with Stern regarding promotional assistance in the face of this testimony from TINS' most knowledgeable witness on that subject.

Plaintiffs' arguments based on the classification of certain events and items as "confidential" is the most blatant example of pulling single words out of context to generate an irrational conclusion. The evidence showed that the Roth–Abrahamson meeting of June 7, 1984, was considered confidential by the participants. The Humphrey memo of June 12, 1984 was also labeled "confidential." In addition, Armstrong's distributorship agreement with wholesalers provides:

> From time to time during the performance of this Agreement, the Wholesaler will become privy to various information considered by Armstrong to be confidential. It is mutually agreed that disclosure of such confidential information by the Wholesaler to any third person or entity will be adequate cause for the termination of this Agreement.

(Nelson & Small Agreement, Px. 1244, ¶ 11). The plaintiffs claim that the very fact that the June 7, 1984 meeting between Roth and Abrahamson was classified "confidential" permits the inference from Roth's statements regarding TINS that Armstrong acted with the necessary malice. (Tr. 39.71–39.73 (Kramer Closing)). This argument is based on pure speculation and ignores the proper context of the meeting. The meeting was properly deemed "confidential" since it involved a broad range of topics dealing with Sterns' business, including financial information. The plaintiffs would have the Court believe that, since the meeting was deemed "confidential" and the TINS system was mentioned, a reasonable juror could find that some dubious, sinister plot existed to destroy TINS because the disclosure of "confidential information" is cause for termination of a distributorship agreement. This speculative quantum leap is based solely on the use of the common, multidimensional term "confidential," without regard to the particular, different context of each use of the term. This Court finds that no juror could make such a connection through a reasonably drawn inference, but only through the impermissible conjecture urged by plaintiffs' counsel.

The plaintiffs also assert that the "Confidential" marking on the top of Humphrey's June 12, 1984 memo (Px 525) would allow a reasonable inference that Armstrong acted intentionally and wrongfully. (Tr. 39.71–39.73 (Kramer Closing)). No reasonable jury could draw such an inference. Even if the explanations of Humphrey and Draeger are disregarded, the only permissible, reasonable inference is that this memo was marked confidential to restrict those who would have access to it at Armstrong. The "confidentials" in the Humphrey memo, in the distributor agreements, and in the Roth–Abrahamson meeting are simply not rationally related in any way. This is particularly true where, as here, there is neither direct nor circumstantial evidence that the contents of the June 12 memo were ever revealed to Stern.[19]

Plaintiffs argue as well that the distributorship agreement provides an incentive for concealment, including perjured testimony before this Court, to avoid termination by Armstrong for revelation of "confidential" information. (Tr. 39.72 (Kramer Closing)). This was another emotional, impassioned, incendiary plea to the jury to draw an impermissible inference. Indeed, the prevalence and emphasis on this argument before the jury in summation prejudiced Armstrong before the jury and contributed significantly to a verdict based not upon reason, objectivity and evidence, but, despite cautions by this Court, upon emotion, spec-

---

**19.** Indeed the evidence reveals that Abrahamson's last contact with Armstrong (Roth) was (at the latest) June 8, 1984. Note the strained, unsuccessful efforts of plaintiffs and their counsel to generate later meetings between those gentlemen. (*See infra* at 59–60.)

ulation, sympathy and impermissible inferences.

The picture painted by the plaintiffs, with their counsel as the artist, was not realism, as it must be for the jury to rationally ascertain and decide the truth, but surreal, a Dali (Salvador Dali, surrealist painter, known for the illogical and inconsistent images of his paintings). The plaintiffs have painted a detached nose in one corner with their unsupported "assistance" argument. The plaintiffs then painted a detached mouth with only one lip, representing the incompleteness and disregarded context of its use of Roth's statements on June 7, 1984. The plaintiffs' use of three unrelated references to the term "confidential," in order to ascribe some significance to it, was the painting of three detached eyes spread far apart and completely unconnected. Then, having pointed out these pieces, the plaintiffs asked the jury to draw lines between them to establish a face portraying malicious intent and wrongful conduct. However, to continue the analogy, the lines do not meet in such a fashion. Instead, connecting these pieces (an effort which itself required rank speculation) leaves the reasonable juror with only a surreal image bearing no resemblance whatsoever to a realistic portrait.

The following language of the D.C. Circuit is particularly appropriate in the present matter:

> We are of course hesitant to nullify a jury's findings of fact.... But the jury's primacy as factfinder cannot exempt it from the bounds of reasonableness. A defendant who is clearly not responsible for a harm should not have to pay for it.... The court submits to the jury only those issues on which the party with the burden of proof offers "significantly probative" evidence.... This judicial screening undoubtedly involves the court in some gauging of probabilities, but only at the extremes.... Performance of the task is an essential backstop to judicial definition of the law; if courts' endorsement of verdicts is automatic, the law, however, sound, can simply drift off into irrelevance as juries do their will.

*Drabkin v. Alexander Grant & Co.*, 905 F.2d 453, 457–58 (D.C.Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 559, 112 L.Ed.2d 566 (1990) (citations omitted). In this case, the jurors' verdict was also without rational, reasonable evidentiary foundation. (*Id.*) [20]

2. Proximate Cause

Even if this Court had determined that there was sufficient evidence to prove tortious conduct by Armstrong, the Court would nonetheless grant defendant's motion for J.N.O.V. on the ground that there was no evidence on the question of proximate cause. Proof that Armstrong's conduct was a proximate cause of plaintiffs' injuries is a required element on which the plaintiffs bore the burden of proof.

All of the relevant evidence on the question of Armstrong's conduct is discussed in the sections concerning the wrongfulness of Armstrong's conduct. Of such evidence, only Roth's statement and the promotional information conveyed to Fischer were ever conveyed to Stern. Even if considered with all other evidence, including Armstrong's strength as Stern's creditor and supplier, the evidence is grossly insufficient as a matter of law to prove causation,

---

**20.** The plaintiffs, both at trial and in opposition to the present motions, place undue reliance on evidence as to 1983 events. The Court, over objection by the defendant, admitted such evidence (including memoranda) from the latter part of 1983 for whatever its probative value might be regarding the claims in the present suit. Even ascribing to the 1983 evidence the maximum weight and materiality which a jury could rationally accord to it, that evidence is insufficient (even when considered with all other relevant evidence) to sustain plaintiffs' claims. This evidence is admittedly remote in time from the commission of the alleged torts in June 1984. Furthermore, there were significant intervening events, including the settlement agreement and the successful sign-up of Armstrong distributors without objection by the defendant, such that the 1983 evidence does not provide sufficient additional support for the jury verdict to permit it to withstand the defendant's motion for J.N.O.V. For a more detailed review of the particular 1983 evidence, see the section of this opinion regarding TINS' claim for punitive damages.

that is that Stern withdrew as a result of pressure from Armstrong. Even the supposed threat of withdrawing promotional assistance (the June 12, 1984 memo) was never communicated to Stern; it cannot therefore constitute a cause of Stern's decision to withdraw from TINS. There is a complete failure to prove proximate cause.

Indeed, the plaintiffs engaged in a conscious, tortured effort to directly improve on the evidence by placing Roth with Abrahamson on more occasions than June 7. Early in the trial, Fineman testified that Roth met with Abrahamson on June 14, June 21 and June 26. (Tr. 2.71). Plaintiffs' counsel, on direct examination of Fineman, then made a concerted effort to line up the Roth–Abrahamson meetings with the days that Stern employees should have had appointments with retailers to present the TINS program. (Tr. 2.78). Then, of course, Fineman would be able to testify that no such appointments were made, leading to the presumption that none were made because of Roth's meetings with Abrahamson during the relevant period. However, in the middle of this, defense counsel objected and the Court conducted a sidebar conference. At the conference, plaintiffs' counsel could not identify the source of Fineman's information about the Roth–Abrahamson meetings, and so the Court recessed for lunch.

Upon returning from the break, counsel and the· Court reviewed the foundation for Fineman's testimony that Roth met with Abrahamson after the June 7 meeting. It was thereupon revealed that the calendar upon which Fineman relied, indicating meetings with Roth after June 7, in fact belonged to another distributor, not Abrahamson. (Tr. 2.82–2.85). The Court was therefore required to give a curative instruction to the jury that there were no such meetings. (Tr. 2.88–2.89). At the time, on the second day of the trial, it appeared that the entire matter was simply an excusable, inadvertent error on the part of plaintiffs and their counsel. Whether or not that remains the Court's conclusion, this transparent effort is symptomatic of plaintiffs' case as a whole which was based on speculation, innuendo and appeals to the jurors' emotions, unsubstantiated by the evidence adduced at trial.

The record is therefore critically devoid of any evidence showing that Stern's decision to back out of the TINS distributorship was made as a result of any pressure or threat from Armstrong. At the very most, it could reasonably be concluded that Abrahamson believed that Armstrong would not support the program through special resilient promotions that would be available for him solely because he was a TINS distributor. While this belief might have been an ingredient in Abrahamson's decision, Armstrong's actions did not rise to the level of being a proximate cause for that decision to withdraw Stern from the TINS program; and no reasonable juror could conclude otherwise.

### D. Elliot Fineman's Individual Tort Claim

■ The jury awarded Elliot Fineman $2.275 million in damages on his claim that Armstrong's tortious interference with TINS' relationship with Stern injured his reputation and goodwill as a consultant to the floor covering industry. Armstrong's entitlement to J.N.O.V. on the tortious interference claim necessarily entitles it to J.N.O.V. on this individual claim as well. However, even if the jury's verdict survived as to TINS, Armstrong is nonetheless entitled to J.N.O.V. as to Fineman's individual claim. There is a critical insufficiency of evidence showing, either directly or by permissible inference, that Armstrong specifically intended to injure Fineman in his individual capacity when it allegedly interfered with the Stern/TINS relationship.

The elements of a claim for tortious interference are based primarily on the *Restatement (Second) of Torts,* as described above. The comments to the Restatement help to interpret it. Specifically relevant to the present question is comment p to § 766, which states in relevant part:

> The person protected by the rule stated in this Section is the specified person with whom the third person had a contract that the actor caused him not to

perform. To subject the actor to liability under this rule, his conduct must be intended to affect the contract of a specific person. It is not enough that one has been prevented from obtaining performance of a contract as a result of the actor's conduct ... thus, if A induces B to break a contract with C, persons other than C who may be harmed by the action as, for example, his employees or suppliers, are not within the scope of the protection afforded by this rule, *unless A intends to affect them. Even then they may not be able to recover unless A acted for the purpose of interfering with their contracts.* (See § 767 comment h.)

(*Restatement (Second) Torts*, § 766, comment p) (emphasis added). Under this rule, *arguendo*, defendant Armstrong is A, Stern is B, and TINS is C. Fineman is a person other than C who is allegedly harmed as a result; and, indeed, is alleging a different financial injury than that sustained by C (TINS). Accordingly, Fineman has a cause of action only if A (Armstrong) *intended* to affect Fineman's contractual relations with others, i.e. his consulting clients.

Comment h to § 767, to which comment p above refers, provides in relevant part as follows:

h. *Proximity or remoteness of actor's conduct to interference.*

If, however, A induces B to sell certain goods to him and thereby causes him not to perform his contract to supply the goods to C, this may also have the effect of preventing C from performing his contractual obligations to supply them to D and E. C's failure to perform his contracts is a much more indirect and remote consequence of A's conduct than B's breach of his contract with C, even assuming that A was aware of all of the contractual obligations and the interference can be called intentional. This remoteness conduces toward a finding that the interference was not improper. The weight of this factor, however, may be controverted by the factor of motive if it

was the actor's primary purpose to interfere with C's obligation to D and E, or perhaps by the factor of the actor's conduct if that conduct was inherently unlawful or independently tortious. Similar results follow in cases in which the person whose contract was the subject of the initial interference has contracts of his own with his employees, his subcontractors or his suppliers, which he is now unable to perform.

In *Glass Bottle Blowers Ass'n v. National Bottle Co.*, 584 F.Supp. 970 (E.D.Pa. 1983), plaintiff union filed an action under Pennsylvania law [21] against National Bottle, the employer of its members, asserting several claims. Plaintiff also asserted a claim for tortious interference with contract against First Pennsylvania Bank, claiming that the Bank's actions as a creditor caused National to be unable to perform under the collective bargaining agreements. The Court dismissed the complaint as to First Pennsylvania, and then various of the other defendants filed a third party complaint against First Pennsylvania asserting a tortious interference claim. These other defendants asserted that if they were found liable for National Bottle's acts, then they would be entitled to recover from First Pennsylvania for tortious interference.

The court dismissed this complaint because, as a matter of law, the allegations did not support the claim. Specifically, the only one who could recover under tortious interference with contract was the Union, not these defendants/third-party plaintiffs, since they were not parties to the contract interfered with. (584 F.Supp. at 972 (quoting *Restatement (Second) Torts* § 766 and Comment p)).

*Norwood Easthill Associates v. N.E.Watch.*, 222 N.J.Super. 378, 536 A.2d 1317 (App.Div.1988) is a recent case exploring New Jersey's rules concerning tortious interference with contract. While it does not address the precise issue at hand, it is useful for its summary of the necessary elements of the cause of action. Plaintiff was a partnership which entered into a

**21.** Pennsylvania and New Jersey both follow the *Restatement (Second) of Torts.*

contract with the Borough of Norwood for the purchase of land the plaintiff wanted to develop. Later, the zoning ordinance was declared invalid, and so plaintiff and the Borough entered into a settlement agreement. During a public meeting to explain the settlement, defendants (a non-profit group of residents opposing the development) made several threats against the Borough, its attorney and the mayor. Thereafter, a court denied approval of the settlement agreement, it was revised, and then finally approved.

Plaintiff brought an action against the defendants for malicious interference with the settlement agreement. The trial court had granted summary judgment to the defendants for several reasons, including the fact that the threats were made against the Borough, not the plaintiff. The Appellate Division disagreed, saying that "[i]f defendants ... sought to affect adversely an agreement *to which plaintiff was a party,* and if such action *directly* affected plaintiff's rights under that agreement, plaintiff might maintain an action for malicious interference." (222 N.J.Super. at 383) (emphasis added).

*Organization of Minority Vendors, Inc. v. Illinois Central Gulf Railroad,* 579 F.Supp. 574 (N.D.Ill.1983), is not a New Jersey case, but does depend on the *Restatement (Second) Torts* and its comments. Plaintiffs were a non-profit organization of minority vendors and black or Hispanic owned businesses. Defendants were several railroads who solicit bids and award contracts for supplies and services. Also named as defendants were several white male owned or controlled vendors who supplied goods and services to the railroads. Plaintiffs asserted numerous causes of action, including a claim for tortious interference with contract. (*Id.* at 605). The Court determined that this count asserted two discrete causes of action. The first was that the white vendors interfered with government funding contracts between the railroads and the federal government by inducing the railroads to breach the affirmative action portions of those contracts. (*Id.*) The second was a claim that the white vendors tortiously in-terfered with the prospective business opportunities of the minority businesses by causing the railroads to fail to fulfill the affirmative action requirement. (*Id.*)

The court dismissed the first cause of action because "[i]mplicit in this definition [of tortious interference] is the requirement that the plaintiff be a party to the contract." (*Id.,* citing *Restatement (Second) Torts,* § 766 and comment p). In so doing, the court rejected the argument that the plaintiffs were third-party beneficiaries of the funding contracts and targets of the white vendors' wrongful acts. (*Id.*) "By focusing on the motive and purpose of the wrongdoer rather than rights under the contract courts in a few jurisdictions have suggested that non-parties to a contract singled out for harm by the defendant can sue for the injuries suffered as a result of the defendant's tortious interference with a contract." (*Id.,* citing *DeVoto v. Pacific Fidelity Life Insurance Co.,* 618 F.2d 1340 (9th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980)). The court rejected this view because "[a]ll the relevant precedent suggests that only direct parties to a contract, and not third-party beneficiaries, can maintain a tortious interference action." (*Id.*)

The *Minority Vendors* court did, however, allow the second tortious interference claim to remain. Unlike the first, this action was for injuries caused by interference with the relationship between the minority owners and the railroads. Accordingly, it did not suffer from the same defect as the first cause of action.

The *DeVoto* case cited by the *Minority Vendors* court was an antitrust and tortious interference case. Pacific Fidelity Life Insurance and American Home Assurance Company both sold mortgage protection insurance to mortgagors. (618 F.2d at 1343). Bankers Mortgage Company was in the business of making real estate loans, and was a sister subsidiary of Pacific. Bankers and American had an agreement by which Bankers provided American with a list of the names of mortgagors for a fee and a commission for each policy sold. Pacific persuaded Bankers to end the agree-

ment in order to provide names to it. The suit was brought by two individuals who were responsible for bringing American and Bankers together and who expected to receive agents' commissions on the contract. (*Id.*)

In addition to an antitrust claim, the plaintiffs alleged that the commissions from the Bankers–American agreement were a business advantage lost as a result of Pacific's inducing Bankers to repudiate the contract. (*Id.* at 1346). The Ninth Circuit reversed a jury verdict in favor of the plaintiffs because there was no evidence that Pacific had any motive or purpose to injure these individuals. (*Id.* at 1347). Thus, the question on which the court focused was the requirement of specific intent to harm the plaintiff. Contrary to the *Minority Vendors* court's reading, the *DeVoto* court did not consider the question of whether a nonparty could seek damages for interference with contract. In fact, the *DeVoto* case can be read to show that a cause of action for the loss of business advantage between plaintiffs and American was valid. (*See id.* at 1347). If so, it appears to be consistent with *Minority Vendors*. As noted above, the Restatement requires at least one of the two elements: specific intent or the status of a party to the contract.

Based on the Restatement and the above cases, it appears that Fineman can collect for the tortious interference allegedly committed by Armstrong only if he has proven that the defendant specifically intended to harm him by interfering with the Sterns–TINS business relationship, since Fineman was not a party to that relationship. Indeed, this Court so instructed the jury based on such precedent. (*See* Jury instructions at 43).[22] In other words, the question is not merely one of foreseeability[23] as the plaintiffs continue to argue. This Court also rejects the defendant's claim that only parties to a con-

tract may sue for its interference. (*See* Defendant's J.N.O.V. Br. at 61–63). Similarly, this Court does not adopt defendant's argument to limit the claim only to interference with any consulting contract between Fineman and Stern. (*Id.* at 64).

There is sufficient proof in the record for a reasonable jury to conclude that Armstrong knew of Fineman's consulting business. The jury could also reasonably conclude that Armstrong knew about and disliked Fineman's advice to distributors to maintain smaller inventories. Indeed, the jury could even reasonably conclude that Armstrong would foresee that destruction of TINS would harm Fineman's reputation in the industry. The evidence does not, however, either directly or by *permissible* inference, show any intent on the part of Armstrong to either "get rid of" or otherwise harm Fineman as a consultant.

All of the evidence upon which plaintiffs rely in support of their tortious interference claims refers only to TINS' efforts in the development of its video magazine, and Armstrong's alleged efforts to thwart TINS' business efforts, as described above. The record is completely devoid of any proof that Armstrong acted with the express (or even implied) purpose of eliminating Fineman's consulting opportunities. Armstrong is therefore entitled to J.N.O.V. as to Fineman's individual claim.

This is further supported by the fact that Fineman never conducted consulting in his own name. Rather, his consulting business was conducted in the form of another corporation, CFIPS, which employed others as consultants besides himself. As with Fineman, the record is completely devoid of any intent to harm CFIPS. Thus, even if this Court determined that Fineman was the "alter-ego" of CFIPS (which it does not, and cannot on this record), there is no evidence of a specific intent to harm that corporation.

---

**22.** The question of whether Fineman could recover on this claim arose during the course of trial. Accordingly, this Court conducted its own research on the question and eventually requested briefs from the parties. Review of all such information led this Court to the conclusion reiterated here and the jury was instructed accordingly.

**23.** Foreseeability is a concept germane to the issue of proximate cause but not determinative of the element of intent to harm.

### E. Punitive Damage Award

■ This Court determines that even if the plaintiffs' claim for tortious interference survived the motion for J.N.O.V., the punitive damage award cannot. The record is critically devoid of that quantum of evidence as to the wrongfulness of the alleged conduct under the legal standard governing such awards.

To obtain punitive damages under New Jersey law the plaintiff must prove either "(1) actual malice, which is nothing less than intentional wrongdoing—an evil minded act; or (2) an act accompanied by a wanton and willful disregard of the rights of another. Clearly, each case must be governed by its own particular facts."[24] *Berg v. Reaction Motors Division*, 37 N.J. 396, 414, 181 A.2d 487 (1962) (quoting *La-Bruno v. Lawrence*, 64 N.J.Super. 570, 575, 166 A.2d 822 (App.Div.1960), *certif. denied*, 34 N.J. 323, 168 A.2d 694 (1961)); *see also Nappe v. Anschelewittz et al.*, 97 N.J. 37, 50–51, 477 A.2d 1224 (1984) (same); Jury instructions at 46. The "wanton and willful" requirement is satisfied upon a showing that there was a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to the consequences. *Berg*, 37 N.J. at 414, 181 A.2d 487. That is, even the second showing requires proof of a "positive element of conscious wrongdoing." (*Id.*)

These standards, however articulated, demonstrate the realization that "only conduct which is particularly egregious will justify an award of punitive damages." *Fischer v. Johns–Mansville Corp.*, 103 N.J. 643, 654–55, 512 A.2d 466 (1986). *See also Leimgruber v. Claridge Assoc., Ltd.*, 73 N.J. 450, 454, 375 A.2d 652 (1977) ("Punitive or exemplary damages are sums ... assessed when the wrongdoer's conduct is especially egregious." (citations omitted)). In other words, "something more than the mere commission of a tort is always re-

quired for punitive damages." *DiGiovanni v. Pessel*, 55 N.J. 188, 190, 260 A.2d 510 (1970) (quoting W. Prosser, *Torts*, § 2 at 9–10 (2d ed. 1955)). Indeed, "mere negligence, however 'gross', is generally held not to be enough." *Berg*, 37 N.J. at 413, 181 A.2d 487 (quoting Prosser, *Torts*, § 369 at 9–10 (2d ed. 1955)). Furthermore, not every intentional tort, even if proven, will support a claim for punitive damages.

Generally, punitive damages may be awarded only "[w]here the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime." *Security Alum. Window Mfg. Corp. v. Lehman Assoc. Inc.*, 108 N.J.Super. 137, 142, 260 A.2d 248 (App.Div.1970) (citing Prosser, *Torts* (3d ed. 1964), § 2, at 9)). *See also Restatement (Second) Torts* § 908, comment b) (same).

The proof presented by TINS in support of its claim for punitive damages fails to meet any of these standards. Indeed, none of the evidence provides even a remote basis for a finding that any act of Armstrong was sufficiently malicious, wanton or egregious to warrant an award of punitive damages in any amount.[25]

For example, the plaintiff relies heavily on a memo written by Armstrong's Csrnko on October 20, 1983, particularly on the following paragraph:

> [W]e feel this program conflicts with the future video plans and certainly would not prove to be in our combined best interests.
>
> ... [I]f you receive any inquiries regarding "TINS", please try to discourage your wholesalers participation and offer suggestions on how their time could be directed towards a more important Armstrong sales effort. Additionally, please notify me as soon as the offer has been made to your wholesaler. I

---

**24.** In this portion of the present opinion, when the Court employs the term "malice" in its discussion of whether TINS has proven its punitive damages claim, it does so as an abbreviated reference to either (or both) of the two punitive damages standards stated here.

**25.** The following analysis shows that the plaintiffs are not entitled to any amount of punitive damages. It is, therefore, not necessary for the Court at this point to discuss the separate issue of the amount of punitive damages ($200 million) awarded.

want to make sure we all stay on top of this competitive effort.

(Px. 5120) (emphasis supplied as provided by the plaintiff, at Plaintiffs' J.N.O.V. Opp. at 16–17). The language of the memo itself refutes an inference of malice of any sort, and certainly does not indicate malice sufficient to warrant imposition of punitive damages. Furthermore, when the entire context of the memo is viewed, it is even clearer that no malicious intent or other outrageous conduct can be derived therefrom:

> We obviously feel the "TINS" program will require a considerable amount of selling time on the part of wholesaler salesmen, which could be better utilized selling Crowne Corlon, Glazecraft, Medintech and other Armstrong resilient flooring products.

(Px. 5120). At most, the jury could reasonably find that Armstrong sales personnel were to discourage wholesalers from becoming TINS distributors in order to devote more time to the sale of Armstrong products. The plaintiffs' argument that this memo is evidence of malice is but an invitation to speculation and conjecture.

The plaintiffs have also placed considerable emphasis (aided by emotional rhetoric) on Humphrey's memo of September 12, 1983. (Px. 165). This mildly worded memo, like that of Csrnko, merely suggests that Armstrong retailers be encouraged to use Armstrong's videos rather than TINS'. It is unreasonable, even ludicrous, to suggest that this memo orders Armstrong employees to act maliciously with respect to TINS, as is evident on its face. The language of this memo, as Csrnko's, is couched in terms of a request rather than a mandatory edict. Again, plaintiffs' reliance, in an impassioned plea to the jury, on one phrase taken out of context cannot support an inference that Armstrong acted with malice in urging its wholesalers to concentrate on sales of its products rather than the TINS program.

Similarly unavailing to the plaintiffs' position is the reliance on the Guzinsky memo of September 27, 1983. (Px. 216A). This memo also refers to the fact that Armstrong distributors' time is better spent selling Armstrong products, and states that "we feel [the TINS] program conflicts with our mutual video plans and would not prove to be in our mutual best interest." (*Id.*) Once again, the language of the memo as a whole, rather than emphasis on a single portion, renders improbable and unreasonable any inference of malice.

It is also significant that these memos were written prior to the Settlement Agreement between Armstrong and TINS. The Settlement Agreement extinguished all claims of the plaintiff for wrongdoing allegedly occurring prior to January 12, 1984. Also the passage of time, plus the intervening events in 1984 diminished their weight considerably; no reasonable jury could determine otherwise. Admittedly, evidence from 1983 was allowed by this Court on the basis that it is somewhat probative on the question of Armstrong's intent in 1984, the period of the alleged tortious interference. However, what the plaintiffs fail to recognize is that the memos, when read in their entirety and not through excerpts extracted out of context, simply do not under any reasoned construction amount to evidence of either actual malice or a wanton and willful disregard of TINS' "rights." It is unreasonable to infer from this evidence, as the plaintiff so emotionally begged the jury to do, that Armstrong deliberately and with malice coerced its wholesalers into refraining from participating in the TINS program.

Plaintiffs' reliance on evidence arising after the Settlement Agreement is similarly unavailing. For example, plaintiffs place considerable weight upon evidence concerning the meeting between Roth and Abrahamson on June 7, 1984. *See* the Court's extensive discussion of this meeting at 244–245, *supra.* The plaintiffs are clearly stretching the bounds of reason by suggesting that Roth's brief remark, in the course of a three-hour conference, supports a finding that Armstrong acted with malice. First, the language of the comment itself does not contain a threat, nor any intent of interfering with Stern's decision to become a TINS distributor. Any infer-

ence that it does could only be the product of fantasy and speculation. Second, the statement does not constitute a breach of the Settlement Agreement as the plaintiffs have continuously suggested. This Court determined as a matter of law that "Paragraph 4 of the [Settlement] agreement does not place any continuing duty on Armstrong to instruct its representatives not to discuss the TINS program with Armstrong wholesalers." (Summary Judgment Op. at 52). Roth's comment does demonstrate, as a reasonable jury could find, disregard for the edict issued in January, 1984 by Armstrong's headquarters that all requests concerning Armstrong's view of TINS be referred to Lancaster. Even so, particularly considering the context in which the statement was made, Roth's comment is insufficient to support an inference of conduct so egregious as to warrant an assessment of punitive damages.

The plaintiffs also place considerable emphasis on the fact that the Humphrey memo was issued on June 12, 1984, only 8 days before TINS began its sales program and 10 days before Stern backed out of the deal. It is well-settled, however, that the fact of one event following another does not support an inference of causation. " 'Inferred factual conclusions based on circumstantial evidence are permitted only when, and to the extent that, human experience indicates a probability that certain consequences can and do flow from the basic circumstantial facts.... [A]ssuming a causal connection between two events merely because one follows the other' is insufficient." *American Bearing Company, Inc. v. Litton Industries*, 729 F.2d 943, 952 (3d Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984) (quoting *Edward J. Sweeney & Sons v. Texaco*, 637 F.2d 105, 116 (3d Cir.1980), *cert. denied* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). As noted earlier in this opinion, Humphrey's memo had a limited circulation, and the record is devoid of evidence that its contents were ever conveyed to Stern.

Plaintiff's assertion that the June 12, 1984 Humphrey memo allows a reasonable inference that Armstrong acted with malice is misguided as well. The language upon which plaintiff relies is the statement that "if any wholesalers request Armstrong's participation, either on a local level or a national basis, you should inform them that we are unable to offer any assistance." (Px. 525). Plaintiffs argue that this language constitutes a threat to revoke any and all promotions from any wholesalers who become involved in TINS. Thus, plaintiffs rely on this language as proof of Armstrong's malicious intent to ruin TINS. However, consideration of this language in the context in which it was written refutes any possible inference of malice or wanton misconduct. The language of the memo itself, as a whole, clearly illustrates that the only reasonable inference is that Armstrong was not willing to provide "assistance" in the form of special, additional promotions only to those Armstrong distributors who were also TINS' distributors. *See* this opinion, *supra*, at 245–248. Once again, plaintiffs' impassioned over-reliance upon language taken out of context is to no avail. No reasonable juror could review this memo and conclude that Armstrong bore any malicious or wanton intent to destroy TINS.

Contrary to plaintiffs' arguments, this Court's summary judgment opinion does not require a different result. In fact, the portion of the Opinion to which plaintiffs refer, page 22, is merely a recitation of the plaintiffs' argument made at the time. It does not reflect this Court's opinion as to the interpretation which should be given to such language. Even if it had, the interpretation suggested by plaintiffs there and here has not been supported by the evidence adduced at trial, and therefore is utterly without foundation.

Furthermore, it is irrefutable that Armstrong had no obligation, whether under the Settlement Agreement or under the law, to provide resources to its wholesalers for use in promoting the TINS magazine. Indeed, it is entirely reasonable and legitimate for Armstrong to require that resources it provides to wholesalers be used only to promote Armstrong products. It is beyond refute that a desire to promote

one's own business, standing alone, negates the requisite state of mind required for a finding of maliciousness or wanton misconduct necessary to support an award of punitive damages. *See e.g. Buono Sales, Inc. v. Chrysler Motor Corp.*, 449 F.2d 715, 723 (3d Cir.1971). It belies common sense and reason to expect one business to actively aid a business which competes, in the sense that TINS' magazine contains advertisements for products manufactured by Armstrong's competitors in the floor covering industry. Accordingly, an inference to the contrary, that is an inference that, from refusal to aid, Armstrong was motivated by a malicious intent to harm TINS, is unreasonable.

This conclusion is further buttressed by the fact that the plaintiffs were fully aware of Armstrong's view that it would not and could not provide favors for those of its distributors who participated in the TINS program. The letter from Draeger to Fineman, attached to the Settlement Agreement, specifically states that "Armstrong cannot, as a matter of policy, recommend a preference for any product which is neither manufactured nor marketed by Armstrong." (Exh. C to Px. 6001).

The existence of notations of "confidential" related to the June 12, 1984 memo, the Roth–Abrahamson meeting, and Armstrong-distributor agreements does not support a finding of malice either. As noted in section II.C of this opinion, *supra* at 248–249, the term "confidential" arises in three completely unrelated instances and contexts, and therefore adds nothing to the plaintiffs' case. The meeting between Roth and Abrahamson was necessarily "confidential" in light of the broad range of subjects covered by such meeting, most particularly, Stern's financial condition. Similarly, the confidentiality term in distributor arrangements is not rationally linked in any manner to Armstrong's view of TINS or any actions taken with respect to Stern's arrangement with TINS. (*See e.g.* Px. 1244 (Distributorship Agreement between Armstrong and Nelson & Small), at ¶ 11). It is clearly designed to protect sensitive, proprietary Armstrong information to which distributors may become

privy. Finally, the notation of "confidential" on the June 12 memo means only that the memo is restricted to those to whom the memo is addressed. As to each and all of the above items, the jurors could not reasonably conclude otherwise. The plaintiffs' effort to connect the term "confidential" in each of these three distinct items to support an inference of malicious conduct by Armstrong represents yet another example of trying to create a picture where there is none.

Thus, the evidence upon which the plaintiffs rely does not support the inferences which they urged upon the jury. Through extracting and emphasizing portions of the evidence out of context, plaintiffs' counsel was able to persuade the jurors to make the impermissible inferential leaps that they did. Once again this Court's earlier analogy to a Dali painting is particularly apt. Another analogy may also be helpful. In the solar system, we are able to connect certain stars with lines to arrive at certain pictures (called constellations), such as the Big Dipper. Such lines would be permissible inferences, given the picture that emerges. In the present matter, plaintiffs have pointed to individual pieces of evidence and asked the jury and this Court to identify a clear, tangible shape from a diffuse, hopelessly unconnected splatter of stars. The picture does not appear, despite counsel's energetic efforts and not inconsiderable powers of persuasion, because no lines (reasonable, permissible inferences) can be drawn between those stars. Again, plaintiffs' arguments appeal not to reason and objectivity, but rather to emotion, sympathy and speculation. Armstrong is entitled to J.N.O.V. as to punitive damages.

## F. Antitrust Claims

Two antitrust claims were presented to the jury: TINS' claims that Armstrong used its alleged monopoly power in the alleged resilient floor covering market as leverage either to (1) acquire or (2) attempt to acquire a monopoly in the alleged market of "video magazine for floor covering retailers," in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

The jury found, by way of special interrogatories, that Armstrong enjoyed monopoly power in the resilient floor covering market or submarket, and used that monopoly power to obtain a monopoly in the video magazine for floor covering retailers' market or submarket.[26] Similarly, the jury found that Armstrong used its monopoly power in the resilient floor covering market to attempt to obtain a monopoly in the relevant video market or submarket. Whereupon, the jury awarded $19.5 million in compensatory damages on the antitrust claims.

 This Court, reviewing all of the evidence, determines that no reasonable jury could have found for the plaintiff TINS on its antitrust claims. As the jury was instructed, an antitrust plaintiff must prove three elements in order to recover damages: (1) an antitrust violation (here, Section 2); (2) fact of damage or injury; and (3) measurable damages. *See e.g. American Bearing Co., Inc. v. Litton Industries*, 729 F.2d 943, 948 (3d Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 112 (1984); *Danny Kresky Enterprises Corp. v. Magid*, 716 F.2d 206, 209 (3d Cir.1983). In the present matter, the jury should never have reached the damages questions because this case turns on proof of certain elements of the antitrust violations.

 Briefly, the elements of the antitrust claims are as follows. First, for both the monopoly and attempt to monopolize claims, TINS was required to prove that there is both a relevant resilient market or submarket and a relevant video market, and that Armstrong enjoyed monopoly power in the resilient market. To succeed in its monopoly claim, TINS had to prove that Armstrong wrongfully acquired monopoly power in the relevant video market (as distinguished from achieving such a position as a consequence of superior product and the like). *See e.g. Bonjorno v. Kaiser Aluminum & Chemical Corp.*, 752 F.2d 802, 808 (3d Cir.1984), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986).

To prove attempted monopoly, TINS had to prove that Armstrong specifically intended to monopolize the relevant video market and had a dangerous probability of success. *See e.g. PA Dental Association v. Medical Service Association*, 745 F.2d 248, 260 (3d Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985). In proving specific intent, "a mere intention to prevail over rivals or improve market position is insufficient. Even an intent to perform acts that can be objectively viewed as tending toward the acquisition of monopoly power is insufficient, unless it also appears that the acts were not 'predominantly motivated by legitimate business aims.'" (*Id.* at 260–261 (citing *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 627, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953)). Direct evidence of specific intent is not required since it may be inferred from predatory or exclusionary conduct. (*Id.* at 261).

Of these elements, several are central to this Court's consideration of the present motions. First, this Court will consider whether the plaintiff[27] sufficiently proved that there is a resilient market or submarket, and second, whether it met its burden of showing that Armstrong had monopoly power in that market. The third consideration is whether it was monopoly power which Armstrong allegedly used to cause Stern to back out, rather than some other aspect of their relationship. Finally, this Court will consider whether plaintiff met its burden of showing either that Armstrong had or acquired monopoly power in the relevant video market or had a dangerous probability of success in its attempt to do so.

---

**26.** Hereinafter, this alleged market will be referred to as the "relevant video market" recognizing that if it exists at all, it is the very specific market which the full term "video magazine for floor covering retailers" defines.

**27.** In the portions of this opinion dealing with the tortious interference claims, the Court refers to plaintiffs in the plural because both TINS and Fineman were plaintiffs there. The Section 2 antitrust claims are TINS' alone, hence the use of plaintiff in the singular.

At this juncture, it should be noted that the jury could rationally and reasonably find sufficient similarity between TINS' and Armstrong's video products to determine that a market for video magazines for floor covering retailers exists, occupied at one time by TINS and Armstrong and now by Armstrong only. This determination is a uniquely factual one, and is arguably supported by viewing the videos themselves, as the jury was able to do. Therefore, this Court will not disturb the jury's finding as to the relevant video market.

### 1. Resilient Market

Review of the evidence in this matter clearly shows that the jury could reasonably have found that there is a resilient floor covering market or submarket. First, there was conflicting evidence as to whether resilient competes with carpet. (*See e.g.* Tr. 9.26 (Lerman); 10.62 (Pomianoski); 16.-61–64, 67–70, 73–75 (Humphrey); 22.64 (Funsten)). The jury, weighing and determining the credibility of such testimony, could reasonably conclude that carpet and resilient are in separate markets or submarkets.

Second, contrary to defendant's argument, the jury could reasonably find that resilient and other hard surface floor coverings are in separate markets or submarkets. The evidence on the question was contradictory. (*See e.g.* Px. 6005 (Armstrong booklet on the differences between resilient and other hard surfaces); DePodwin's Report and testimony (Px. 1000D; 30.57–30.58); *cf.* Tr. 9.22 (Lerman); 8.126–127, 8.131–132 (Fineman); 10.63–10.64 (Pomianoski)). The jury's resolution of that issue will not be disturbed.

### 2. Monopoly Power in the Resilient Market

■ The second necessary element of both the monopoly and the attempted monopoly claims is proof that Armstrong had monopoly power in the resilient market. Generally, "monopoly power" is defined as the power to control prices or to exclude competition. *See e.g. PA Dental Association,* 745 F.2d at 260 (citing *United States*

*v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 380, 76 S.Ct. 994, 998, 100 L.Ed. 1264 (1956)); *Weiss v. York Hospital,* 745 F.2d 786, 827 (3rd Cir.1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985); *Borough of Lansdale v. Philadelphia Elec. Co.,* 692 F.2d 307, 311 (3d Cir. 1982).

■ A primary criterion used to determine whether a defendant has monopoly power in a relevant market is the defendant's market share. *PA Dental,* 745 F.2d at 260 (citation omitted). In fact, existence of monopoly power "ordinarily may be inferred from [a] predominant share of the market." *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1703, 16 L.Ed.2d 778 (1966). In *Grinnell,* the Court held that an 87% share of the market constituted monopoly power. (*Id.*) Similarly, in *American Tobacco Co. v. United States,* the Court held that "over two-thirds of the entire domestic field of cigarettes, and . . . over 80% of the field of comparable cigarettes" constituted "substantial" monopoly power. 328 U.S. 781, 797, 66 S.Ct. 1125, 1133, 90 L.Ed. 1575 (1946). *See also Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 489 n. 11 (5th Cir.1984) (citing cases finding monopoly power where market shares ranged from 70% to 100%).

At the other end of the spectrum, a market share of 35% was insufficient as a matter of law to establish monopolization. *PA Dental,* 745 F.2d at 261. *See also Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 666 (7th Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987) (citing cases where defendant had less than 25% of the market share, and so did not have monopoly power). In general, most courts accept the rule of thumb enunciated by Judge Learned Hand, that while a 90% market share definitely is enough to constitute monopolization, "it is doubtful whether 60 or 64 percent would be enough; and certainly, 33 percent is not." *United States v. Aluminum Company of America,* 148 F.2d 416, 424 (2d Cir.1945), *approved and adopted, American Tobacco,* 328 U.S. at

811–814, 66 S.Ct. at 1139–41. *See e.g. Broadway Delivery Corp. v. United Parcel Service,* 651 F.2d 122, 129 (2d Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981) ("[A] market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power.")

Many cases suggest that absent special circumstances, a defendant must have a market share of at least fifty percent before he can be guilty of monopolization. *See e.g. Domed Stadium,* 732 F.2d at 489 and n. 11. The same is true with attempted monopoly claims: a market share in the middle of the spectrum requires proof of additional factors before such an attempt may be found. (*Id.* at 490–491).

■ The evidence in the present matter regarding Armstrong's share of the resilient floor covering market as of 1984[28] is somewhat conflicting. Since the jury was not asked to make a specific determination on the verdict sheet regarding this market share, this Court will, as it must, assume that the jury believed plaintiffs' evidence and determined that Armstrong's share is approximately 50%. As a matter of law, this market share is not alone determinative of whether or not Armstrong had monopoly power in the resilient market.

The plaintiff places considerable emphasis upon evidence that the defendant's market position was "dominant." (Plaintiffs' J.N.O.V. Opp. at 45–46 and evidence cited therein). This evidence is not sufficient to overcome the fact that a 50% market share is not determinative. It is obvious that the term "dominant" (and other such language) reasonably includes a determination that Armstrong had a 50% market share. It is unreasonable, however, to infer from such language that Armstrong had a significantly greater percentage of the market than that.

Because the market share in the present matter is not determinative of monopoly power, other factors must be considered. Other relevant factors that the courts have identified include: the size and strength of competing firms, freedom of entry into the field, pricing trends and practices in the industry, ability of consumers to substitute comparable goods [or] services from outside the market, and consumer demand factors. A defendant's power either by itself or aided by these other factors must be enough to restrict entry, supply or price. *Weiss,* 745 F.2d at 827 n. 72. (citations omitted). *See also U.S. v. DuPont,* 351 U.S. at 403–404, 76 S.Ct. at 1010–11 (other evidence, including that showing size and strength of competitors, showed that defendant did not have market power); *Reazin v. Blue Cross and Blue Shield of Kansas,* 899 F.2d 951, 970–972 (10th Cir.), *cert, denied,* —— U.S. ——, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990) (reviewing other evidence where market share was at most 40% to 60%); *U.S. v. Syufy Enterprises,* 903 F.2d 659 (9th Cir.1990) (where market share is high enough to create inference of monopoly power, inference may be overcome by evidence of low entry barriers or inability to control prices or exclude competitors)).

This Court finds that the record critically lacks that minimum quantity of evidence of such additional factors which would support a finding that Armstrong had monopoly power in the resilient market. First, there was no evidence that Armstrong had the ability to raise prices in the resilient market. In fact, the only evidence was to the contrary. For example, Daniel Proctor, Vice President of a floor covering distributor who distributed Armstrong products and others, testified that Armstrong has not always been successful in raising prices. Mr. Proctor described a recent example: on November 1, 1990, Armstrong raised its prices but "had to roll back because, quite honestly, a lot of our competitors did not raise their prices." (Tr. 25.56).

---

**28.** The relevant time period on the question of monopoly power in resilient is 1984, since that is the time at which Armstrong allegedly acted.

The plaintiff also made much of the evidence that Armstrong's market share has increased in the period from 1984 to 1990. (*See* Px. 5108). This evidence is nonetheless insufficient to support a finding of monopoly power in the resilient market. First, the increase has not been yearly, as demonstrated by Mannington Mills' report showing a decrease in 1989. More importantly, however, the increase reflected in this report is not substantial, showing a total increase of 3.6% for the period between 1985 and 1990. Finally, the same report shows that two of Armstrong's top competitors have experienced an increase in market share over the period and two have experienced a decrease. Thus, while the evidence shows that Armstrong has experienced an overall increase in market share, it is insufficient to support a finding of monopoly power, particularly as of 1984.

The evidence about the size and strength of competitors in the resilient market also shows that Armstrong does not have monopoly power in that market. Fred Lerman, owner of a floor covering distributor that had distributed TINS' video magazine, testified that "our industry is very competitive and everybody that's in business tries to have what I would consider an edge over competition". (Tr. 9.15). Mr. Proctor testified that the floor covering business is very competitive. (Tr. 25.56). James Starks, employed by a competitor of Armstrong, testified that the top three competitors held approximate market shares of 15.2%, 10.9%, and 7.8%. (Tr. 10.117; *see also* Px. 5108). These unrefuted values, which the jury was not free to ignore, are not insubstantial, and clearly show that Armstrong's competitors are effective forces in the market.

The plaintiff relies heavily on the fact that many floor covering distributors are "captive", in that they sell certain products made by only one manufacturer. (*See e.g.* Px. 1000H, "The Impact of Tariff and Nontariff Barriers on the U.S. Sheet Vinyl Flooring Industry"). Because this system is employed by all major domestic manufacturers of resilient, however, that evidence relates to the definition of the resilient market, not whether Armstrong has monopoly power in it. The evidence showed that the nature of this particular market is that a manufacturer distributes products through several particular distributors who do not carry the same product manufactured by others. This structure is not the result of any monopolization effort, but rather is a systemic, common practice in the industry. (*See e.g. Houser v. Fox Theatres Management Corp.*, 845 F.2d 1225, 1231 (3d Cir.1988) (common practice in the industry necessarily serves legitimate competitive purpose)). The jury could not reasonably conclude from this evidence that Armstrong had monopoly power, because *all* major resilient floor covering manufacturers operate primarily through captive distributors. Stated somewhat differently, a manufacturer's economic influence over a distributor is a reflection of the one-on-one relationship between that manufacturer and distributor, and so is not probative evidence of monopoly power.

There was also unrefuted evidence that, within the resilient market Armstrong did not even "control" the top distributors. In a list of the top 50 distributors for 1983, only three of the top 10 distributors carried Armstrong resilient products at all. (Px. 623). Of the top 50, only 17 (or 34%) distributed Armstrong resilient products. (*Id.*) Such evidence does not support a finding that Armstrong had monopoly power in the resilient market, and in fact refutes such a finding.

There is considerable evidence that consumers can substitute other hard surfaces and even carpet for resilient products. (*See* discussion regarding resilient market, above). Such evidence, although not determinative of market definition in this case (*supra*), constitutes yet another factor weighing against the reasonableness of the jury's determination that Armstrong had monopoly power in the resilient market.

The plaintiff also relies on various other bits of evidence to oppose the defendant's motion. First, plaintiff asserts that "testimony disclosed that the profits of Armstrong distributors are substantially higher (approximately 300% higher) than those of other distributors." (Plaintiffs' J.N.O.V.

Opp. at 46 (citing Tr. 15.68)). Review of the record indicates, however, that this is a mischaracterization of Mr. Humphrey's testimony. His testimony was that Mr. Fineman had indicated that the usual profit was 1%, and he, Mr. Humphrey, said that was wrong, and pointed to Armstrong distributors' profits of approximately 3%. Humphrey's testimony was *not* to the effect that Armstrong distributors receive 3% profit while others receive 1%, as the plaintiff claims, but rather was contradictory evidence of profit margins in the industry as a whole, using Armstrong's distributors as an example. This testimony provides no support for the plaintiff's position.

■ The plaintiff also asserts that "Armstrong's advertising expenditures greatly exceed that of its competitors." (Plaintiffs' J.N.O.V. Opp. at 47 (citing Mr. Fineman's testimony at Tr. 1.36)). Once again, the plaintiff mischaracterizes the evidence. The entire relevant section is as follows:

Q: [Mr. Kramer] Now, did you ever have occasion to compare the revenue that Armstrong enjoyed with the revenue of its closest competitor?

A: Yes, I did.

Q: What was the ratio?

Mr. Voorhees: Excuse me, your Honor. I believe some foundation—

The Court: No context, no time frame. Objection sustained.

Mr. Kramer: Yes, your Honor.

Q: During what time period did you have occasion to make this comparison?

A: I, through my whole—I spent 21 years in the floor covering industry. 14 of them at Benjamin Berman and then seven with my own consulting company and with Tins [sic]. Certainly over the period of my consulting years I got to be very familiar with figures for Armstrong; what they spent on advertising, what they spent compared to the [sic] competitors, what their market position was relative to their competitors. It was just information I needed to have to do my business of consulting.

Q: Now, based upon that, did you have any estimate of about how many times, if at all, Armstrong was bigger than its next closest competitor, let's say in advertising revenue for any given period?

Mr. Voorhees: We've narrowed it down to three years, but there's still no explanation [sic] what documents.

The Court: Advertising revenues.

Mr. Kramer: I'm sorry, your Honor, advertising expenditures.

The Court: Overruled. Set a time frame.

Q: Set a time frame before you answer the question, Mr. Fineman.

A: Well, I had, for example, another visual aid which will show that over a period of a three-year period I believe 1984 through 1987—

Mr. Voorhees: Excuse me, your Honor, could we see the visual aid?

The Court: It's an appropriate moment for the jurors to take a recess anyway.

(Tr. 1.35:21–1.37:9). Thus, Mr. Fineman never answered the question about Armstrong's advertising expenses.[29] It is well settled that an attorney's question does not constitute evidence in a case, and so plaintiff's argument concerning this "evidence" is without merit.

Thus, each of the factors which must be considered weigh only against a finding of monopoly power. Even taken together and considered in a light most favorable to the plaintiff, the evidence in this case is critically deficient and does not support a reasonable jury finding that Armstrong had monopoly power in the resilient market. Accordingly, Armstrong is entitled to J.N.O.V. as to this element, which is enough, by itself, to justify J.N.O.V. as to the plaintiff's two antitrust claims. Nonetheless, this Court will consider proofs as to additional elements as well.

### 3. Use of Monopoly Power

Even if this Court held that the jury correctly determined that Armstrong had monopoly power in the resilient market, it

---

**29.** Indeed, the document upon which Fineman was going to base his testimony was not admitted into evidence. (Tr. 1.38–1.52 (voir dire of witness and sidebar discussions)).

would be compelled to grant Armstrong's motion on the question of whether it was this monopoly power which Armstrong used with Stern.

As explained above, one element of the plaintiff's monopoly claim is that Armstrong willfully acquired or maintained monopoly power in the relevant video market, or, attempted to do so. *See e.g. Houser,* 845 F.2d at 1230. In other words, the defendant must have acted without a legitimate purpose, and the result complained of was not the result of natural skill, competition, and so forth. *(See e.g. id.* at 1231) (Act complained of was common in the industry and served legitimate purpose, and therefore was not a basis for inferring that the purpose of the act was to willfully maintain monopoly power.)

The specific allegation here was that Armstrong used its monopoly power in the resilient market to catapult itself into the relevant video market by causing Stern to withdraw from the Letter of Intent to become a TINS distributor. *(See e.g.* Plaintiffs' J.N.O.V. Opp. at 12 n. 4: "the same conduct that amounted to tortious interference with contract under state law was independently a violation of the federal antitrust laws because Armstrong leveraged its monopoly power in one market to obtain monopoly power in another"). In other words, the plaintiff's claim is that "the same conduct" of Armstrong which constitutes the alleged tortious interference is also the basis for the antitrust violation. This Court determines that even if the tortious interference claim was sustainable,[30] such conduct is not even arguably the exercise of monopoly power. Therefore, even affording to plaintiff all the evidentiary indulgence that a J.N.O.V. motion requires, no jury could reasonably have concluded that it was.

▪ The evidence in this case, as described above, shows that "captive" distributors are the norm in the industry. By definition, manufacturers are able to exert influence over their distributors; this influence is not, however, exercise of monopoly power. Monopoly power is concerned with the manufacturer's ability to affect an entire market. *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (The antitrust laws were enacted for "the protection of *competition,* not *competitors.*") (emphasis in original). In contrast, the "influence" available to manufacturers like Armstrong depends on the relationship between a manufacturer and each individual distributor. Where the manufacturer supplies a high percentage of the distributor's inventory, or has extended substantial credit to the distributor, a degree of influence or control is to be expected and is therefore reasonably inferred. In addition, exercise of that control is usually within the realm of permissible and legitimate business conduct. Even where exercise of such influence is wrongful, it is necessarily limited to the individual distributor being affected, and therefore does not constitute exercise of monopoly power.[31] Accordingly, evidence related to Armstrong's influence over Stern does not support a reasonable finding that the exercise of any such influence constituted the use of monopoly power.

In addition to evidence showing the customary structure of the industry, there was considerable evidence about the specific relationship between Stern and Armstrong. In particular, Stern was extended substantial credit by Armstrong, and was undercapitalized even to the point of becoming a troubled company, in Armstrong's view. *(See* Px. 5014 (regarding security agreement between Armstrong and Stern); Px. 5015 (regarding personal guarantee of Abrahamson on credit extended by Armstrong to Stern)). Assuming, for purposes of the present analysis, that a reasonable inference from such evidence is that the unique position of Armstrong with respect

---

30. Of course, it was not, as earlier portions of this Opinion reflect.

31. More specifically, in the case at bar, the record is devoid of any evidence that Armstrong

in 1984 discouraged any of its other distributors from becoming TINS distributors. Indeed, Sound, Tri–West and Funston did so, and Bebco had signed a Letter of Intent and paid a deposit.

to Stern would have permitted it to influence (or even coerce) Stern's decision not to become a TINS distributor, that is not the exercise of monopoly power. Any conclusion to the contrary is not supported by the evidence, is not reasonable, and is insufficient to sustain the jury verdict. It was the plaintiff's burden to prove that elimination of TINS from the relevant video market was the result of Armstrong's exercising its resilient market *monopoly* power (not some other power) upon Stern. The plaintiff failed to produce sufficient evidence of this element upon which the jury could reasonably find in it's favor.

Thus, the plaintiff's claims of monopolization and attempted monopolization of the relevant video market must fail because the defendant did not use any monopoly power in the resilient market to persuade Stern to back out. Once again, this failure is sufficient by itself to justify granting defendant's motion for J.N.O.V. as to both antitrust claims. There is, however, yet another reason for granting the motion which the Court will now discuss.

### 4. No Monopoly or Dangerous Probability of Success

■ The plaintiff's claim that Armstrong used its monopoly power to monopolize the relevant video market requires proof that Armstrong in fact acquired monopoly power in the relevant video market. The legal standards for this determination are the same as those relating to the question of whether Armstrong had monopoly power in the resilient market, described above. That is, monopoly power is defined as the power to control prices or to exclude competition. Several factors must be considered here.

In the present matter, no reasonable jury could conclude that Armstrong had monopoly power in the relevant video market either in 1984 or since.[32] The evidence is uncontroverted that Armstrong's videos are restricted to information about Armstrong products, and are therefore of no interest to non-Armstrong distributors and retailers. As indicated above, Fineman testified that there are about 450 floor covering distributors. The evidence actually shows that only about 70 distributors received Armstrong's videos in 1984, which represents only about 15.5% of all available distributors. Of these, most did not send the videos to retailers. (Tr. 1.59 (Fineman); 16.55, 17.122–123 (Humphrey); 21.108, 21.-110, 21.134–135, 21.140–44 (Downey)). Clearly, this market share is, if anything, evidence of lack of monopoly power in the relevant video market. The evidence also shows that of the top 50 floor covering distributors, only 17 (or 34%) distribute Armstrong products. (Px. 623).

The only reasonable inference from this evidence is that Armstrong's video was of absolutely no interest to approximately 66% of the largest distributors in the market. At most, Armstrong could be said to control 34% of the relevant video market.[33] As the discussion concerning monopoly power in the resilient market shows, 34% of the market is insufficient as a matter of law to support a finding of monopoly power.

**32.** Armstrong argues that the only relevant period is 1984, the time of the alleged acts. If this is correct, however, no antitrust plaintiff could ever succeed in a leveraging case in which the defendant first removed the plaintiff from the market and then inserted itself at a later date. Certainly, the antitrust laws cannot be skirted by such timing of entry into the market. Furthermore, references throughout this opinion to Armstrong's videos should be deemed to refer to all such products produced or planned over the years to the present date, including the present disc medium Floor Fashion Centers.

**33.** It should be recalled at this point that the relevant video market, which the jury reasonably found existed, was not restricted to either Armstrong or non-Armstrong retailers, but in fact included both. Additionally, even if this figure regarding wholesalers does not translate exactly into the same nationwide percentage of retailers, it demonstrates the vast percentage of the market in which Armstrong has no interest and vice versa. Indeed, the record evidence is that Armstrong's penetration of all retail outlets is even smaller because Armstrong sells only through wholesalers while many other manufacturers sell directly to a vast number of retail outlets without intervening wholesaler/distributors. *See* the considerable evidence introduced by plaintiff to establish a multitude of potential customers for the TINS video magazine.

Furthermore, consideration of the other factors relevant to the monopoly power determination only supports the inevitable conclusion that no reasonable jury could have determined that Armstrong had monopoly power in the relevant video market. The only evidence as to competitors in the market shows that other manufacturers do produce video programs for their captive distributors, thus showing their size and strength. Furthermore, any other floor covering manufacturer could very easily enter the field by simply providing similar services to its distributors. It is evident from such evidence that Armstrong has no ability to restrict entry into this market, and certainly cannot affect the supply or price of videos which non-Armstrong wholesalers or retailers would be interested in purchasing.

The fact that the jury found that Armstrong is the only company in the relevant video market does not alter these conclusions. The uncontroverted evidence in this matter showed that Armstrong never targeted and does not distribute its video products to the hundreds of wholesalers who do not carry Armstrong products. These non-Armstrong wholesalers (and *their* retailers) constitute a viable and substantial segment of the floor covering industry. (*See e.g.* Px. 623 discussed above). Thus, Armstrong has not achieved a monopoly in the relevant video market. There is too large a segment of that market which, although arguably not now serviced by such a magazine, could be, without any proven pressure or likelihood of presence therein by Armstrong.

 The same evidence also requires this Court to grant Armstrong's motion on the attempted monopoly claims. In order to succeed with a claim of attempt to monopolize, the plaintiff must show, *inter alia,* that there was a dangerous probability that the defendant would have successfully achieved a monopoly. *Stearns v. Genrad, Inc.,* 752 F.2d 942, 947 (4th Cir. 1984) (citations omitted). Although the courts "must be particularly wary of the numbers game of market percentage when considering an 'attempt to monopolize' suit

... a defendant must have some legally significant share of the market before he approaches the level of dangerous probability of success condemned by the attempt provision of section two." *Domed Stadium,* 732 F.2d at 490 (citations omitted).

A "legally significant share" of the market, although lower than the market share required for a presumption of monopoly power, is nonetheless substantial.

> We do not suggest here a market share percentage that of itself rises to the level of legal significance, but note that a share of less than fifty percent generally required for actual monopolization may support a claim for attempted monopolization if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present.

(*Id.,* citations omitted).

In the present matter, Armstrong sold or otherwise distributed its videos to considerably less than 50% of the relevant video market. Accordingly, other factors become important. While there is evidence showing barriers to entry into the resilient market, there is no such evidence concerning the relevant video market. Plaintiff's reliance on the former is simply irrelevant as to the video market.

Similarly, there is no evidence relating to the other factors described by the *Domed* court which would otherwise suggest that Armstrong had a dangerous probability of successfully monopolizing the relevant video market. Indeed, the only evidence shows that a significant majority of the relevant market (that segment which does not distribute Armstrong products at all) has no interest in obtaining Armstrong videos. It cannot be said as a matter of common sense and reason (the proper standards for a jury verdict) that Armstrong attempted to monopolize a market wherein such a large segment would never be targeted for or interested in Armstrong's video products.

Thus, the structure of the relevant video market itself precludes a finding of dangerous probability of success. The unrefuted

evidence necessarily negates a finding of specific intent to monopolize because Armstrong has no intent (and certainly no reason) to sell its videos to non-Armstrong distributors. Indeed, all of the memos upon which plaintiffs place great emphasis express the concern that participation by an Armstrong distributor in TINS reduces resources available to devote to selling Armstrong products. Furthermore, non-Armstrong distributors constitute approximately 66% of the 50 leading distributors. Even an intent to sell to 34% of that portion of the market cannot, without more, support a reasonable inference of specific intent to monopolize. This is particularly true where the conduct involved is not in itself egregious or invidious, as the Court has determined in the present case. *See e.g. PA Dental*, 745 F.2d at 261 (Specific intent to monopolize may be inferred from predatory or exclusionary conduct; necessarily, if there is no such conduct, other evidence is crucial).

In summary, then, this Court finds that the evidence proven in this matter critically fails in several crucial respects. First, no reasonable jury could have found that Armstrong had monopoly power in the relevant resilient market. Second, no reasonable jury could have found that even if Armstrong did have such power, it was the exercise thereof which caused Stern to back out of its relationship with TINS. Finally, no reasonable jury could have found that Armstrong has monopoly power in the relevant video market, or that it was dangerously likely to gain such power and had the specific intent to do so.

## CONCLUSION

Throughout the foregoing sections of this lengthy opinion, the Court has necessarily commented upon some of the evidence. Although some other items of arguably relevant evidence have not been cited, they have not been ignored. With the benefit of a full transcript and the trial exhibits, the Court has reviewed the complete record. As stated frequently in this opinion, when ruling on a motion for judgment n.o.v. this Court may not substitute its own views for those of the jurors if the latter are reasonably based upon an arguable construction of the evidence. The Court has taken seriously its limited scope of review of the evidence. It has not made its own assessment of the credibility of witnesses. It has not invoked testimony from witnesses whose credibility has been seriously challenged by the plaintiffs. It has indulged all reasonable, permissible inferences, on issues pertinent to the present motions, in favor of the plaintiffs. Evidence invoked by the Court has predominantly (if not exclusively) been that which was stipulated, uncontested, unrefuted and/or presented by the plaintiffs themselves. Viewed in light of the proper standards for considering a motion for J.N.O.V. (*see supra* at 231–232 and *passim*), the Court has exercised its obligation on such motions in order that the "sound" law will control this case rather than "simply drift off into irrelevance" due to the jury's unsupportable "will." *Drabkin v. Alexander Grant & Co.*, 905 F.2d 453, 458 (D.C.Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 559, 112 L.Ed.2d 566 (1990).

For the reasons set forth above, this Court grants defendant's motions for judgment n.o.v. as to all verdicts rendered by the jury in favor of the plaintiffs or either of them. An Order For Judgment Notwithstanding the Verdict has today been filed with the Clerk of the Court.